

1997 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-22-1997

# Chang v. INS

Precedential or Non-Precedential:

Docket 96-3140

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1997

Recommended Citation

"Chang v. INS" (1997). *1997 Decisions*. Paper 164.
http://digitalcommons.law.villanova.edu/thirdcircuit_1997/164

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1997 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

iled July 22, 1997

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 96-3140

FENGCHU CHANG,

Petitioner

v.

IMMIGRATION & NATURALIZATION SERVICE,

Respondent

Petition for Review of an Order dated January 5, 1996
of the Immigration & Naturalization Service
(Immigration & Naturalization No. A72 376 988)

Argued on November 13, 1996

Before: ALITO, ROTH and LEWIS, Circuit Judges

(Opinion Filed July 22, 1997)

Martin A. Kascavage, Esq.
Jane M. Schoener, Esq. (Argued)
Suite 595
21 South 5th Street
The Bourse Building
Philadelphia, PA 19106

 Attorneys for Petitioner

Frank W. Hunger
Acting Assistant Attorney General
Civil Division
Joan E. Smiley
Senior Litigation Counsel
Michael P. Lindemann
Lisa M. Arnold
Vernon B. Miles
Madeline Henley (Argued)
Attorneys, Civil Division
United States Department of Justice
Office of Immigration Litigation
Ben Franklin Station
P.O. Box 878
Washington, DC 20044

 Attorneys for Respondent

**OPINION OF THE COURT**

ROTH, Circuit Judge:

Fengchu Chang, a fifty-five year old native and citizen of China, seeks asylum and withholding of deportation based on his fear of persecution for violating China's State Security Law. Chang, the chief engineer for a state-owned company, led a technical delegation to this country from July through September of 1992. During the course of this visit, Chang violated Chinese law (1) by not reporting to the Chinese authorities the members of his delegation whose misconduct (under the rules set by the Chinese government) suggested they would remain in the United States, (2) by meeting with an FBI agent as arranged by the American company hosting the delegation, and (3) by electing to stay in the United States and to seek asylum after being told by the FBI that he was in "danger." Based on these violations of Chinese law, Chang fears reprisal if he returns to China. The Immigration Judge ("IJ") denied his application for asylum and for withholding of deportation. The Board of Immigration Appeals ("BIA") dismissed his appeal, reasoning that because Chang faces

2

prosecution only under a law of "general applicability," he does not fear "persecution" based on his political opinion. We disagree and will grant Chang's petition.

I. FACTS

Before leaving China in July of 1992, Chang worked simultaneously as the chief engineer of a major state-owned company with more than 3000 employees, as director of a state Research Institute with more than 100 employees, and as senior consultant to the Ministry of Machinery and Electronics. In the course of his professional duties, Chang had access to confidential technical information about state projects.

Chang had traveled outside of China on several previous occasions, always in connection with the technical positions he held in China. For the 1992 visit to this country, Chang was selected as head of the delegation. In this capacity he was briefed by a special security agent and instructed to monitor the behavior of the other delegates and to report any suspicious activity to the Chinese Embassy. The 1992 delegation of eight people, including Chang, visited the United States in connection with a purchase of technology by Chang's company from an American company, Pangborn Corporation.

After the arrival of the delegation in the United States on July 27, 1992, Chang became suspicious that several members of the delegation were considering remaining in the United States. At the beginning of August, Chang overheard a telephone conversation in which one delegate discussed the possibility of remaining in the United States. Chang observed the same person making another phone call about three weeks later. During the second week of September, Chang learned from officials at Pangborn that another delegate had met with them and intended to stay in the United States. Chang also became suspicious of a third delegate who had contacts in the United States and said that she was checking the procedures for studying in the United States in the future.

As head of the delegation, Chang was required to report his suspicions to the Chinese Embassy. Not certain that the

delegates actually planned to remain in the United States and fearful of the consequences that they would suffer at the hands of the Chinese government if he did report them, Chang did not report either their conduct or his suspicions to the Embassy. Another member of the delegation, who also suspected that one or more delegates might stay in the United States, told Chang to call the Chinese Embassy. He also told Chang that he would report Chang to the Chinese government upon return to China because Chang had not complied with the orders of the Chinese government.

Chang nonetheless still intended to return to China in the middle of September, even after becoming suspicious that other delegates might stay in the United States and despite his concern that their staying and the other delegate's report to the government would create risks for him upon return to China. On about the 17th of September, Chang explained his situation to an engineer at Pangborn, in a conversation initiated by the engineer who had noted that Chang was distraught. Chang told the American that if some of the delegates remained in the United States, he (Chang) would face problems upon return to China.

Pangborn officials suggested, and arranged for, Chang to meet with Barry O'Neill, a person who Chang understood to work in the Hagerstown Government. Only later did Chang learn that O'Neill worked for the Federal Bureau of Investigation. Chang explained his concerns about his safety upon return to China. O'Neill questioned Chang about his work and his family and asked if he had access to state secrets.

On September 23, 1992, at O'Neill's suggestion, Chang met with O'Neill a second time at the Pangborn offices. O'Neill reported to Chang that "everything is true," that Chang was "in danger," that the only thing Chang could do was seek political asylum, and that a special agency in Hong Kong would assist Chang's family in leaving China. Later that day, again at the suggestion of O'Neill, Chang and O'Neill met with an immigration officer in Baltimore. Based on that meeting and on what O'Neill had told him, Chang applied for political asylum. On September 27, the delegation returned to China without Chang. Unknown to

4

Chang at that time, one other member also did not return with the delegation to China.

The INS denied Chang's request for asylum and on July 26, 1994, charged Chang with overstaying his visa, which had expired in September 1992. Chang conceded deportability but requested political asylum and withholding of deportation. At a hearing before the Immigration Judge on June 5, 1995, Chang testified that he fears persecution if he is returned to China based on his access to Chinese state secrets, on his prominent position in China, on his contact with the FBI, on his decision not to return to China and to seek asylum in the United States, and on his failure to report the misconduct of other delegates. If he is returned to China, Chang fears that he will lose his job, that he will be imprisoned, and that his family will suffer retaliation. Since leaving China, Chang has spoken with his wife and sister and has learned that his wife has been forced to retire and has been questioned by security agents, that the local security agency has revoked his passport, that his defection has been treated as a foreign affairs incident, and that his photo is on record at the Ministry of State Security. His sister, who holds a high position in their hometown, advised Chang not to return to China because the local security agency is "waiting for you."

The Immigration Judge denied Chang's petition in a somewhat delphic oral opinion. The Judge reasoned that prosecution "is not persecution unless that prosecution is severe or somehow politically motivated," and that if "the punishment is severe for prosecution of a crime, one must look to see if that punishment was imposed because of some political motive." The Judge concluded that Chang did not face persecution "for any political opinion" and that instead Chang had only shown "a self-created, subjective fear of returning now of either losing his job or being prosecuted for a failure in his responsibility."

Chang appealed to the BIA, which dismissed Chang's appeal on January 5, 1996. The BIA opinion reviews the facts of the case and concludes that:

For the reasons set forth in the Immigration Judge's decision, we find that the respondent has not

established that a reasonable person in his circumstances would fear persecution on account of race, religion, nationality, social group or political opinion. See Elias-Zacharias v. INS, 502 U.S. 478 (1992). In particular, we note that the respondent fears prosecution in China because he failed to report his colleagues' suspicious activities and because he sought asylum in the United States. The prosecution he fears is similar to what he believes his colleagues would have been subject to had he reported to the Chinese Embassy. However, prosecution for the violation of a law of general applicability is not persecution, unless the punishment is imposed for invidious reason. Matter of Acosta, 19 I&N Dec. 211 (BIA 1985), modified on other grounds, Matter of Mogharrabi, supra, Matter of Nagy, 11 I&N Dec. 888 (BIA 1966). In that it appears from the testimony and evidence presented that China's security laws are generally applied, there is no indication that any action against the respondent would be imposed for invidious reasons. We conclude that the prosecution the respondent fears should he return to China does not constitute persecution as contemplated by sections 208(a) and 243(h) of the Act.

The BIA ordered Chang to depart from the United States voluntarily by March 1, 1996, subject to extension by the district director, or to face deportation.

Chang petitioned this Court for review of the BIA's January 5, 1996, order. We have jurisdiction over Chang's petition pursuant to 8 U.S.C. § 1105a(a), which has been repealed but still applies to this case because the order of deportation was entered before September 30, 1996. Illegal Immigration Reform and Immigrant Responsibility Act of 1996 §§ 306(c)(1), 309, and 604 (c), Pub L. No. 104-208, 110 Stat. 3009 (1996), reprinted in 8 U.S.C.A. §§ 1105a, 1252, 1101 (under "Historical and Statutory Notes") (Supp. 1997).1

---

1. For this reason we refer to the Immigration and Nationality Act as it existed prior to amendment by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996.

II. DISCUSSION

Section 208(a) of the Immigration and Nationality Act
("INA") provides that the Attorney General may, in her
discretion, grant asylum to an alien who qualifies as a
"refugee" within the meaning of Section 1101(a)(42)(A) of
the statute. 8 U.S.C. § 1158(a) (1988 & Supp. 1992). The
term refugee includes those who are unable or unwilling to
return to their country of nationality "because of
persecution or a well-founded fear of persecution on
account of race, religion, nationality, membership in a
particular social group, or political opinion." 8 U.S.C.
§ 1101(42)(A). The INA also provides, in Section 243(h)(1),
that the Attorney General must withhold deportation to a
country if the alien's "life or freedom would be threatened
in such country on account of race, religion, nationality,
membership in a particular social group, or political
opinion." 8 U.S.C. § 1253(h). In order to be eligible for a
discretionary grant of asylum under Section 208(a), an
alien need only show a "well-founded fear of persecution,"
but on the other hand, in order to establish entitlement to
withholding of deportation under Section 243(h)(1), an alien
must show "a clear probability" of a threat to life or
freedom. INS v. Cardoza-Fonseca, 480 U.S. 421, 428 (1987);
Fatin v. INS, 12 F.3d 1233 (3d Cir. 1993).

Chang's petition requires us to decide whether the term
"persecution" under the INA includes the prosecution that
Chang purportedly faces upon return to China and, if so,
whether that persecution is "on account of" Chang's
political opinion. We must also review whether Chang has
demonstrated a "clear probability" of a threat to life or
freedom so as to qualify for withholding of deportation and,
in addition, whether he has established a "well-founded"
fear of persecution so as qualify for a discretionary grant of
asylum by the Attorney General.

Our review of the BIA's decision is narrow. As to the
BIA's construction of the INA, if Congress has evidenced
"clear and unambiguous intent concerning the precise
question" before us, then we give effect to that intent.
Chevron, U.S.A., Inc. v. National Resources Defense Counsel,
467 U.S. 837, 843 (1984); Marincas v. Lewis, 92 F.3d 195,
200 (3d Cir. 1996). If the statute is silent or ambiguous, we

7

defer to the agency's interpretation if it is "based on a permissible construction of the statute." <u>Chevron</u>, 467 U.S. at 843; <u>Fatin v. INS</u>, 12 F.3d at 1239. Under this standard, we will not substitute our own judgment for that of the BIA, but we must also reject any interpretation by the BIA that is "arbitrary, capricious, or manifestly contrary to the statute." <u>Chevron</u>, 467 U.S. at 844. On questions of fact, we will reverse the BIA's determination that Chang is not eligible for asylum and not entitled to withholding of deportation only if a reasonable fact-finder would have to conclude that the requisite fear of persecution existed. <u>INS v. Elias-Zacharias</u>, 502 U.S. 478, 480 (1992).

A. <u>Punishment Under "Generally Applicable" Laws</u>

We begin by considering whether Chang has failed to show that he qualifies for asylum or withholding of deportation simply because he fears punishment under China's Security Law, which the BIA concluded is "generally applicable." Chang fears prosecution under the security laws because he did not report the actions of other delegates which suggested they would defect, because he did not return to China, because he sought asylum in this country, and because he spoke with the FBI. The BIA reasoned that since the security laws that Chang violated were "generally applicable," Chang had not shown that he would be prosecuted for an "invidious reason." Therefore, the agency concluded, whatever punishment Chang feared could not constitute "persecution" within the meaning of the statute.[2]

The statute itself does not define the term persecution. As a general matter, however, we have held that fear of prosecution for violations of "fairly administered laws" does

_____

2. The BIA refers to "persecution as contemplated by Section 208(a) and 243(h) of the Act." Section 243(h) does not use the term "persecution," instead it requires a "clear probability of a threat to life or freedom" on account of one of the enumerated factors. We understand the BIA as concluding that prosecution under generally applicable laws cannot qualify as "persecution" under Section 208(a) or as a "threat to freedom" on account of one of enumerated factors under Section 243(h). Consistent with the BIA's language, we use the term "persecution" to refer to the standard under both Sections 208(a) and 243(h).

8

not itself qualify one as a "refugee" or make one eligible for withholding of deportation. Janusiak v. INS, 947 F.2d 46 (3d Cir. 1991); see also Abedini v. INS, 971 F.2d 188, 191 (9th Cir. 1992); In Matter of Acosta 19 I. & N. Dec. 211, 233 (BIA 1985). The refusal to equate fugitive status with eligibility for asylum prevents the United States from becoming a haven for "common criminals." See Kovac v. INS, 407 F.2d 102, 104 (2d Cir. 1969). Thus those who violate laws governing fraudulent passports, military conscription, the distribution of certain films and videos, and population control do not merit asylum based on their fear of punishment for the crime that they committed. Janusiak, 947 F.2d at 48 (rejecting claim of persecution based on prosecution for bribing passport officials); M.A. v. INS, 899 F.2d 304, 312 (4th Cir. 1990) (rejecting claim that penalties for evading laws of conscription constitute persecution); Abedini, 971 F.2d at 191 (holding that punishment for avoiding military conscription, use of false passport, or distributing Western films was not persecution); Chen v. INS, 95 F.3d 801, 806 (9th Cir. 1996) (violating population control laws and fear of possible punishment under those laws does not constitute persecution).

Nothing in the statute or legislative history suggests, however, that fear of prosecution under laws of general applicability may never provide the basis for asylum or withholding of deportation. To the contrary, the statute provides protection for those who fear persecution or threats to life and freedom "on account of" a number of factors, including religion and political opinion, without distinguishing between persecution disguised as "under law" and persecution not so disguised. As the Second Circuit cautioned, in a case concerning illegal departure from Yugoslavia, "the memory of Hitler's atrocities and of the legal system he corrupted to serve his purposes ... are still too fresh for us to suppose that physical persecution may not bear the nihil obstet. of a `recognized judicial system.' " Sovich v. Esperdy, 319 F.2d 21, 27 (2d Cir. 1963). The language of the statute makes no exceptions for "generally applied" laws; if the law itself is based on one of the enumerated factors and if the punishment under that law is sufficiently extreme to constitute persecution, the law

9

may provide the basis for asylum or withholding of deportation even if the law is "generally" applicable.

This reading of the statute, unlike the BIA's, is both faithful to the language of the statute and consistent with its legislative history. In the 1980 Refugee Act, Congress amended the INA to include Section 208(a), providing for discretionary grants of asylum to those who qualify as refugees. The Act also amended Section 243(h), making withholding of deportation mandatory if the alien demonstrates a clear probability of harm on account of one of the enumerated factors. INS v. Cardoza–Fonseca, 480 U.S. 421, 429 (1987). One of Congress's "primary purposes" in enacting the 1980 law was to harmonize United States law with the United Nations Protocol Relating to the Status of Refugees ("U.N. Protocol"), to which the United States became a party in 1968. U.N. Protocol Relating to the Status of Refugees, Jan. 31, 1967, 19 U.S.T. 6223, T.I.A.S. No. 6577. Congress specifically sought to define "refugee" in accordance with the Protocol; the definition of refugee under the 1980 Act is thus almost identical to the definition in the Protocol. Id. at Art. 2; See Cardoza–Fonseca, 107 S. Ct. at 1215– 1216 (reviewing legislative history). In interpreting the Protocol, and especially the definition of "refugee," the courts have been guided by the Office of the United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status ("Handbook"), which lacks the "force of law" but nonetheless provides significant guidance in construing the Protocol. Cardoza–Fonseca, 480 U.S. at 439 n.22; Marincas v. Lewis, 92 F.3d 195, 204 (3d Cir. 1996); Osorio v. INS, 18 F.3d 1017, 1027 (2d Cir. 1994). The Handbook unequivocally provides that persecution is not the same as "punishment for a common law offense," Handbook ¶ 56, but it is equally clear that prosecution under some laws – such as those that do not conform with accepted human rights standards – can constitute persecution. Id. at ¶ 59.

Moreover, prosecution under the type of law at issue here, one which restricts its citizen's entry into, or stay in, other countries, has long been recognized by the BIA, by the courts, and by the Handbook, as providing a possible basis for a claim of persecution. As the Handbook sets out:

10

The legislation of certain States imposes severe penalties on nationals who depart from the country in an unlawful manner or remain abroad without authorization. Where there is reason to believe that a person, due to his illegal departure or unauthorized stay abroad is liable to such severe penalties his recognition as a refugee will be justified if it can be shown that his motives for leaving or remaining outside the country are related to the reasons enumerated in Article I A(2) of the 1951 Convention.

Handbook at ¶ 61. Thus, according to the Handbook, if the asylum-seeker's motives in leaving his or her country were "related" to "political opinion," and the applicant faces "severe penalties" under the laws of the state, prosecution under those laws can constitute persecution. In Matter of Janus & Janek, 12 I. & N. Dec. 866 (BIA 1968); Rodriquez-Roman v. INS, 98 F.3d 416, 427 (9th Cir. 1996); Sovich v. Esperdy, 319 F.2d 21 (2d Cir. 1963); Coriolan v. INS, 559 F.2d 993, 1000 (5th Cir. 1977)3.

Similarly, the Handbook provides that

In determining whether a political offender can be considered a refugee, regard should also be had to the following elements: personality of the applicant, his political opinion, the motive behind the act, the nature of the act committed, the nature of the prosecution, and its motives; finally, also the nature of the law on which the prosecution is based. These elements may go to show that the person concerned has a fear of persecution and not merely a fear of prosecution and punishment-within the law-for an act committed by him.

_____

3. Matter of Janus and Janek involved brothers who claimed asylum based on their fear of punishment under Hungarian law for overstaying their visits in the United States and for seeking asylum. The BIA reasoned that "[i]t cannot be said, across the board, that every statute imposing criminal sanctions for unauthorized travel outside of a particular country must be devoid of political implications." The BIA concluded that the brothers faced not "punishment for violation of an ordinary criminal statute" but instead "persecution for the political offenses" committed against Hungary. 12 I. & N. Dec. at 875.

Handbook ¶ 86. Again, it is simply not enough to conclude, as the BIA did in this case, that a law applies "generally" and therefore prosecution under that law cannot support a claim for asylum or withholding of deportation. Rodriquez-Roman, 98 F.3d 416; Fisher v. INS, 37 F.3d 1371, 1382 (9th Cir. 1994); see also Bastanipour v. INS, 980 F.2d 1129 (7th Cir. 1992). Based on the language and legislative history of the statute, we are constrained to reject the BIA's interpretation of the term persecution because it is not based on a permissible construction of the statute. Chevron, 467 U.S. at 844.

B. Persecution "on Account of Political Opinion"

We now consider whether the persecution that Chang claims he faces is "on account of political opinion" and therefore comes within the purview of the INA. We have rejected the BIA's conclusion, and the INS's argument, that the general applicability of China's law, without more, answers this question. The INS also argues, however, that under INS v. Elias-Zacharias, 502 U.S. 478 (1992), Chang has not shown that China's punishment of him would be "on account of" his political opinion because China may be motivated by factors other than Chang's political opinion in electing to prosecute him. After our review of the conduct that the China seeks to compel, of Chang's reasons for violating the rules, and of the nature of the rules in question, we hold that the evidence compels the conclusion that China's motives in enforcing its rules against Chang are based on Chang's political opinion.

Contrary to the IJ's reasoning in this case, the evidence permits no other conclusion than that Chang's violation of the Security Law was motivated by his "political opinion." In the words of the BIA, Chang "chose not to report the possibility [that some of his colleagues would not return to China] because he feared that the suspected delegates would have been returned to China, fired from employment, and imprisoned regardless of whether they had intended to remain in the United States." Chang defied the Chinese government's orders because he disagreed with the government's treatment of those who might defect.4 He took

_____

4. The dissent finds that Chang's own testimony belies such a conclusion. See p. 26. But at the hearing Chang was asked why he did

12

a personal risk to defy the government because of the manner in which that government would punish the other delegates. To characterize this action and Chang's motivation in taking it as anything other than political narrows the term "political" beyond recognition.5 Unlike those, for example, who violate population control laws because they want more children, see Chen v. INS, 95 F.3d 801, 805 (9th Cir. 1996), or those who violate exit control laws in search of economic opportunity, see Si v. Slattery, 864 F. Supp. 397, 406 (S.D.N.Y. 1994), Chang failed to report his fellow delegates based solely on his disagreement with the punishment that they were likely to face at the hands of the Chinese government. This action came not because of, but in spite of, his concerns for his family and his fear of retaliation.

The IJ reasoned that Chang

did make a choice not to return to China and [ ] it

_____

not call the Chinese Embassy and report his colleagues. Chang responded that he was "familiar with China's conditions. This things has a bearing of the person's life, future," and that upon return to China the individuals who broke the rules "will be put in a special check room -- check room, a block house security agency, a military, and then to make clear -- to make sure what happened. Anyhow, they will lose their job and lose job, keep them (indiscernible) until the security agency they made (indiscernible)." (A.R. 122-123). Chang in effect is stating that he did not report his colleagues because of the punishment that they would face in China. (This is also exactly what the BIA found. (A.R. at 3)). On the basis of such testimony, we find it reasonable to conclude that Chang was defying the orders of the Chinese government because he disagreed with the government policy behind them. We do not find it necessary for Chang to use the word "political" in order to satisfy the test set forth in Fatin v. INS, 12 F.3d 1233, 1242 (3d Cir. 1993).

5. See, e.g., the definition of "political" in Black's Law Dictionary, 5th Ed. (1979):

Pertaining or relating to the policy or the administration of government, state or national. Pertaining to, or incidental to, the exercise of the functions vested in those charged with the conduct of government; relating to the management of affairs of state, as political theories; of or pertaining to exercise of rights and privileges or the influence by which individuals of a state seek to determine or control its public policy...."

13

could be believed or perceived by many that his choice of not returning to China was somehow motivated on the principle that he opposes in some way to the Chinese government. The respondent, however, has not manifested such opposition. He has manifested in his application his support and sympathy for incidents

such as the Tianamen Square incident in 1989 and his reluctance to restrict individuals when they are abroad conducting their profession. Yet, that is not the test that the Court must apply in determining whether or not such manifestations are such that they warrant political asylum.

To the contrary, the evidence compels a reasonable fact finder to conclude that Chang has "manifested" opposition to the Chinese government. His actions in defying the orders of the Chinese government because he disagreed with how they would treat those suspected of trying to defect did exactly that. Simply because he did not call himself a dissident or couch his resistance in terms of a particular ideology renders his opposition no less political. See Osorio v. INS, 18 F.3d 1017, 1029 (2d Cir. 1994) (reasoning that resistance is no less political simply because alien did not state that he belonged to a political party, or which political philosophy he supported).

We must, of course, look beyond Chang's motives to those of China. Elias-Zacharias, 502 U.S. 478 (1992), requires that China's enforcement of its Security Law be "on account of " Chang's political opinion in order for Chang to qualify for relief. Indeed, an applicant for asylum must show not that the persecutor's motives for persecuting the applicant are "political" in some general sense but instead that the persecutor is motivated specifically by the political opinions of the asylum-seeker. Thus the Court held in Elias-Zacharias that persecution for failing to join a guerilla movement was not, on its face, "on account of " the applicant's political opinion. Instead the guerillas sought to fill their ranks and retaliated against those who refused to fight based on their refusal to fight, not based on their political opinion.

The Immigration Judge in this case made no adequate finding as to the Chinese government's motives in enforcing

14

the security laws against Chang, although the opinion concludes that Chang did not fear persecution on account of one of the enumerated grounds. The BIA based its reasoning that Chang's persecution was not on account of political opinion because the law, under which he would be prosecuted, applies generally. This is a conclusion, however, that we have already rejected.

In addition to ignoring the U.N. Handbook and relevant cases, the BIA and Immigration Judge also failed to consider the nature of the statute being enforced and the actions that China sought to compel by that statute, both of which help determine the motives of the alleged persecutor. For example, enforcement of a statute aimed at the expressive conduct of political dissidents would constitute persecution based on "political opinion," but the enforcement of rules governing conscription does not necessarily constitute persecution. This distinction is necessary to effectuate the language of the INA – otherwise, breaking any "law", no matter how directly that law was aimed at political opinion, would permit the state to say that it was punishing the conduct of breaking the law, not the political opinion that led to that conduct.6 See Perkovic v. INS, 33 F.3d 615, 622 (6th Cir. 1994) (holding that punishment under laws against peaceful political expression is "on account of" political opinion); Bastanipour v. INS, 980 F.2d 1129, 1132 (7th Cir. 1992) (reaching the unassailable conclusion that prosecution under law against apostasy is "on account of " religion); Rodriguez–Roman v. INS, 98 F.3d 416 (9th Cir. 1996) (holding that punishment for politically–motivated violations of exit laws constitutes punishment "on account of" political opinion).

In this context, we conclude that China's enforcement of the rules governing Chang's unauthorized stay in this country and his refusal to report others who violated

_____

6. One could virtually always argue that prosecution under laws prohibiting political dissent is not "on account of" political opinion because the persecutor is concerned with the action, not the opinion that motivates it. (i.e., "we prosecute him because he says things critical of the government, but we do not care if he actually holds this opinion."). Elias–Zacharias does not require this result.

security rules would be "political." The Criminal Code provides a one year prison term for those who do nothing more than violate its exit control laws. As the Ninth Circuit has reasoned:

The Second Circuit stated the proposition unequivocally: "It would be naive to suppose ... that punishment for illegal departure ... is not politically motivated, or does not constitute punishment because of ... political opinion." [Sovich v. Esperdy, 319 F.2d 21 (2d Cir. 1963)]. Because the crime is intended to punish those who exhibit a grave form of disloyalty to their homeland, we simply acknowledge here what should by now have been apparent to all: that a state which severely punishes unlawful departure views persons who illegally leave as disloyal and subversive and seeks to punish them accordingly. Thus the motive that a petitioner must show on the part of the state is initially established on the face of a statute that criminalizes illegal departure.

Rodriguez-Roman v. INS, 98 F.3d at 430 (internal footnote omitted).

The nature of China's Security Law makes clear the importance of scrutinizing the statute or rules pursuant to which the applicant claims prosecution is likely. According to the Human Rights Watch/Asia, July 29, 1994 Report, which is part of the administrative record, "the principal objective" of the 1993 Regulations for the State Security Law "appears to be to frighten dissidents into halting their activities." The Report goes on to say that the State Security Law may be used to prosecute "all activities actionable under the `counterrevolution' clauses of the Criminal Code, while avoiding the alarm caused in the international community by the overtly political language of the latter." To this end the regulations leave "completely vague and open to political interpretation" the definition of "harm to state security." Although we recognize that the use of materials prepared by "watchdog" organization is not without its problems, see M.A. v. I.N.S., 899 F.2d 304, 313 (4th Cir. 1990), this report at least suggests that the INS should have carefully examined China's motives in enforcing its Security Law. We do not suggest that relief to

16

an alien should be granted based solely on such reports particularly where they conflict with findings of the Department of State. In this case, however, the Human Rights Watch/Asia report is consistent with the State Department report that is also part of the administrative record and which says, in part, that although in "several instances" the Chinese government brought its behavior "into conformity with internationally accepted human rights norms," that China has not yet "significantly mitigated continuing repression of political dissent."[7]

Moreover, even if we should determine that the law itself does not establish the requisite motive, we would nonetheless conclude that Chang's unique situation compels the realization that the state's motive is, in part, political. In selecting Chang to head the delegation, the Chinese government entrusted him with politically sensitive obligations to limit the freedoms of other delegates by preventing them from meeting or talking with other people without permission, by restricting their use of the phones, and by reporting all suspicious behavior to the Chinese Embassy. When Chang, specifically selected by the government to preform these sensitive tasks, refused to comply because he disagreed with the punishment that the government would mete out for violations, China's enforcement of the security laws is at least in part"on account of " Chang's political opinion. To argue that Chang is prosecuted merely for "breaking the law" and not on "political" grounds is to turn a blind eye to the motives of the government. Those motives are, at least in part, to punish those, like Chang, who have manifested opposition

_____

7. The United States Department of State released a new CHINA COUNTRY REPORT ON HUMAN RIGHTS PRACTICES FOR 1996 on January30, 1997, which documents that in 1996 "[s]ecurity policy and personnel were responsible for numerous human rights abuses," and that the Chinese government "continued to commit widespread and well-documented human rights abuses ... stemming from the authorities' intolerance of dissent, [and] fear of unrest...." This report plays no role in our decision, however, because it is not part of the record in this case.

17

to the policy of the Chinese government and to prevent others from taking similar political actions.8

The INS argues that China may have been motivated by legitimate concerns of protecting confidential state information. As an initial matter, we note that neither the BIA or the IJ mentioned this consideration as a basis for their opinions, nor did they make a factual finding or indeed, even suggest, that these were China's motives. More fundamentally, even if this concern motivated the Chinese government in part, we conclude that China was also motivated, at least in part, by Chang's opposition to official policy. Osorio v. INS, 18 F.3d 1017, 1028 (2d Cir. 1994) (finding that the plain meaning of the phrase"persecution on account of the victim's political opinion" does not mean persecution solely on account of the victim's political opinion). This conclusion is based on the statute itself, which provides potentially harsh punishment for mere violation of the exit laws, on the responsibilities with which Chang was entrusted, on the appearance of disloyalty and political opposition as a result of Chang's actions, and on Chang's actual motivations in breaking China's laws. See Matter of Janus and Janek, 12 I. & N. Dec. 866, 874 (1968) (considering Janus' standing in the Communist party, his

_____

8. Our conclusion does not suggest that all Chinese visitors who overstay their visas or emigrate without permission are eligible for asylum. Chang's fear of persecution upon return is not based simply on his departure, it is also based on his refusal – on political grounds – to report his colleagues as he was instructed to do. This political resistance, not economic concerns, generated his fear and led to his overstaying his visa. We leave for another occasion the question under what circumstances an applicant, who violates exit laws but who has no political motive in so doing – although perhaps the government imputes such a motive – may qualify for asylum based on fear of prosecution under the exit laws. See Rodriquez–Roman, 98 F.3d at 430 (holding that the applicant must flee homeland for political reasons in order to qualify for asylum based on violating exit laws.)

Moreover, as the next section discusses, Chang's fear of persecution upon return is unique and compelling. Thus those who flee China for economic reasons, or because they have violated another statute, may be able to prove neither that China's persecution of them would be "on account of" their political opinion or that their fear of persecution is "well–founded," but in this case we reach neither question.

18

obligation to propagandize for the Czech government, the severity of punishment that he faced, and the government's concern with defection, and concluding that Janus faced not punishment for violating an ordinary criminal statute, but persecution for the political offense he has committed against the state).

C. The "Well-Founded" Fear of Persecution and the "Clear Probability of Persecution" Standards

Chang must demonstrate that his fear of persecution is "well-founded" in order to qualify for a discretionary grant of asylum under section 208(a) of the Refugee Act of 1980. He must also show that he faces a clear probability of harm to qualify for mandatory withholding of deportation under Section 243(h) of the Act. We will reverse on these two questions only if a reasonable fact-finder would be forced to conclude that Chang has shown the requisite fear of persecution. Elias-Zacharias, 502 U.S. at 481. Under the "clear probability" of persecution standard of § 243(h), the Attorney General must withhold deportation if Chang demonstrates that upon return to China "his life or freedom would be threatened" on account of one of the statutory factors. 8 U.S.C. § 1253(h)(1); Fatin, 12 F.3d at 1237. To meet this standard, Chang must show with objective evidence that it is "more likely than not" he will face persecution if he is deported to China. INS v. Cardoza-Fonseca, 480 U.S. 421, 430 (1987).

The test under § 208(a) is less exacting; Chang need only show that he has a subjective fear of persecution that is supported by objective evidence that persecution is a reasonable possibility. See Cardoza-Fonseca, 480 U.S. at 430, 440; Matter of Mogharrabi, 19 I. & N. Dec. 439, 445 (BIA 1987) (holding that "an applicant for asylum has established a well-founded fear if he shows that a reasonable person in his circumstances would fear persecution"). This lesser standard does not require a showing that persecution is more likely than not. Fear can be well-founded even "when there is a less than 50% chance of the occurrence taking place." Cardoza-Fonseca, 480 U.S. at 431. If Chang meets this standard, the Attorney General may, but is not required to, grant asylum.

19

In evaluating the likelihood that Chang faces persecution upon return to China, we begin with a consideration of the possible punishment that Chang faces under China's laws. China's treatment of those who violate the security laws is relevant both as to how likely it is that Chang will be punished and as to whether or not such punishment would constitute persecution. Only if that punishment is severe enough to constitute "extreme conduct," can it constitute persecution. See Fatin v. INS 12 F.3d 1233, 1240 (reasoning that the term persecution does not "encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional"). Although"generally harsh conditions shared by many other persons" do not constitute "persecution," id. (quoting In Matter of Acosta, 19 I. & N. Dec. 211, 233 (BIA 1985)), the term does include threats to life, confinement, torture, and economic restrictions so severe that they constitute a real threat to life or freedom. Fatin, 12 F.3d at 1240. To prove his claim, Chang must therefore show either that he has a well founded fear or that there is a clear probability that he will suffer not just harm, but harm that qualifies as "persecution" under this standard.

According to Chang's testimony at the hearing before the Immigration Judge and in his application for asylum, upon return to China, Chang would be arrested, detained in a "block house," imprisoned, and lose his job. The INS introduced into evidence a United States Department of State Report on country conditions in China, which notes that Article 176 of the Criminal Code provides a prison sentence of up to one year for violating China's exit laws. Most economic immigrants, according to the Report, are not imprisoned upon return to China, although some repeat offenders have received one year "administrative sentences" of imprisonment in labor camps. Chang submitted a report, authored by Ross Munro of the Foreign Policy Institute, which found that because of Chang's access to privileged information, his high status in the Chinese government, and the position with which the Chinese government entrusted him, Chang would face a longer sentence. The Department of State Report concluded that political dissidents in general do not fare well in China; the Report relates that "in 1994 there continued to be widespread and

20

well-documented human rights abuses in China, in violation of internationally accepted norms, stemming both from the authorities' intolerance of dissent and the inadequacy of legal safeguards for freedom of speech, association and religion." Such abuses "include arbitrary and lengthy incommunicado detention, torture and mistreatment of prisoners." AR 0199.

The BIA did not discuss the likelihood that Chang would face persecution on return to China, and it is difficult to determine exactly what the immigration judge concluded on this subject. The immigration judge stated in his oral opinion that "as indicated, in country conditions [sic] the government of China does not persecute its members simply for returning after they have been in another country illegally." Leaving aside the problem that Chang has done more than remain in this country illegally, the "as indicated" does not refer to any previous discussion or statement by the judge concerning the country conditions of China. The judge stated in the previous paragraph that he was not convinced that Chang "would, in fact, be punished as that term is defined under the Act as a means of persecution for any political opinion." This appears to go to the motives of China in exacting punishment, not to whether it enforces its security laws, and nowhere does the judge state a basis for reaching any conclusion about the "country conditions of China."9 Indeed, at the outset of the opinion the judge stated that neither the State Department report nor the report of Ross Munro provided much "weight to its decision."

As discussed, Chang testified that both he and his fellow delegates faced potential imprisonment and economic repercussions for violations of the security laws, a claim that the BIA repeated without comment. The IJ made no finding that this testimony lacked credibility. See Sotto v. INS, 748 F.2d 832, 837 (3d Cir. 1984) (remanding in part because IJ and BIA must articulate reasons for discrediting

_____

9. The opinion appears to confuse three distinct issues: whether Chang's fear of persecution is well-founded, whether what he fears is severe enough to constitute "persecution," and whether the punishment that he fears would be imposed for one of the statutorily prohibited grounds.

21

evidence before them); Hartooni v. INS, 21 F.3d 336, 341 (9th Cir. 1994) (reasoning that although the IJ is in the best position to make credibility determinations, the IJ must offer a specific reason for disbelieving the applicant's testimony or the court should accept the testimony as true); see also, Salameda v. INS, 70 F.3d 447, 451 (7th Cir. 1995) (vacating BIA order that did not "address[ ] in a rational manner the questions that the aliens tendered for consideration"). Further, the State Department Report, introduced by the INA, supports this claim. Chinese law provides that violations of exit laws alone can result in a year of punishment, and those who express political opposition to the Chinese government may face imprisonment and torture. It is uncontroverted that Chang violated the security laws in several ways, and as the IJ acknowledged, Chang's actions "could be believed or perceived by many" as being motivated by political opposition to the Chinese.

Under these circumstances, punishment of up to one year of imprisonment under Article 176, and perhaps significantly more, are sufficiently severe to constitute "persecution" under this Circuit's standard in Fatin. See Rodriguez-Roman v. INS, 98 F.3d 416, 431 (9th Cir. 1996) (concluding that three years in prison for leaving Cuba qualifies as persecution); Janus & Janek, 12 I. & N. at 875 (holding a year long sentence enough to constitute persecution for leaving Hungary). We simply cannot credit the IJ's unexplained conclusion about China's country conditions. And even if it is true that China does not generally punish those who simply violate its exit laws, that conclusion has little to do with this case, where the violation of the security laws was far more extensive and fraught with political implications.

We now turn to a related inquiry -- the likelihood that Chang will experience this persecution if he is returned to China. In addition to the information about China's laws in general, the evidence in this case is that 1) Chang violated China's Security Law by remaining in the United States and by failing to report others to the Chinese government; 2) one other member of the delegation also failed to return to China; 3) China is aware that Chang remained in this

22

country beyond the time that he was permitted to do so and may be aware that he seeks asylum; 4) Chang held a high-level position in the Chinese government and was privy to confidential state technical information; 5) China has treated his defection as "foreign affairs incident" and posted his photograph at the local security office; 6) the FBI told Chang that he was "in danger"; 7) Chang's wife was forced to retire early and his son is not allowed to attend the university. The IJ noted that the information about the incident being treated as a foreign affairs incident was provided by Chang's sister, but that she did not submit a letter, although "she probably could have done so." We defer to this conclusion that the evidence from the sister lacked credibility, and we do not consider it further. The IJ also noted that Chang gave no confidential information to the FBI and that it is not clear that the Chinese government is aware that Chang sought political asylum in this country or met with the FBI.

It would be virtually impossible for Chang to demonstrate what the Chinese government does or does not know about his conversations with the FBI or about his application for asylum. It is beyond dispute, however, when a high-ranking state employee entrusted with supervising an entire technical delegation suddenly and inexplicably fails to return to China, leaving his important positions with the Chinese government and his entire family behind, that the Chinese government may suspect that the he applied for asylum in this country. Even assuming, however, that China does not know or believe that Chang applied for asylum, Chang has demonstrated disloyalty to the Chinese through his unauthorized stay in this country such that, given his position with government and his responsibilities in supervising the delegation, it is more likely than not that he faces persecution upon return.

In reaching this conclusion, we are particularly mindful of the responsibilities with which Chang was entrusted by China and of the unusual role of FBI in this case. Chang did not initiate contact with the FBI. The uncontroverted evidence shows that the FBI told Chang that he was in "danger." Certainly this constitutes strong objective evidence that Chang was, in fact, in danger. The FBI agent

23

went so far as to escort Chang to the meeting with the immigration officer. And although we do not know what the Chinese government knows of Chang's meetings with the FBI, we agree with Chang that, regardless of whether he gave information to the FBI, the Chinese government is more likely than not to believe that he did. Of course, the Chinese government may not know anything of his meeting with the FBI. This possibility is one factor in the calculus, but we cannot disregard the possibility that China does know of the FBI meeting.

III. CONCLUSION

Considering the evidence of China's laws and practices and the facts of Chang's case, we are compelled to conclude that Chang faces a better than even likelihood that he will experience a significant term of imprisonment that constitutes persecution if he is returned to China. Chang is thus entitled to withholding of deportation under 8 U.S.C. § 1253(h). He also meets the less exacting requirements of 8 U.S.C. § 1158(a), and is therefore eligible for a discretionary grant of asylum. The order denying witholding of deportation and asylum is therefore vacated, and the case is remanded for the Attorney General's decision as to whether Chang is entitled to a discretionary grant of asylum.

24

ALITO, Circuit Judge, dissenting:

The facts of this case, as recounted in the majority's opinion, arouse considerable sympathy for petitioner Feng Chu Chang. There is, however, no basis for upsetting the decision of the Board of Immigration Appeals.

The immigration judge and the BIA found that Chang failed to prove that he had a well-founded fear of persecution on account of political opinion. We are required to uphold that decision unless no reasonable factfinder could have so found. See INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992). In Fatin v. INS, 12 F.3d 1233 (3d Cir. 1993), we held that:

In order to prevail on a withholding-of-deportation or asylum claim based on political opinion, an alien must (1) specify the political opinion on which he or she relies, (2) show that he or she holds that opinion, and (3) show that he or she would be persecuted or has a well-founded fear of persecution based on that opinion.

Id. at 1242.

In this case, Chang argues that if he is returned to China he will be prosecuted for violating that country's state security law. Even if one assumes that the prosecution that Chang fears qualifies as "persecution," and even if one assumes that Chang's fear is "well-founded," the immigration judge and the BIA had reasonable grounds for finding that such prosecution would not be "on account of" Chang's "political opinion." See 8 U.S.C. §1101(42)(A). This is so for the simple reason that Chang has never specified any political opinion that he holds and that is at odds with the Chinese government.

The relevant evidence is easily summarized. Chang, who had no desire to defect, became suspicious that one or more members of his delegation intended to do so, but his suspicion was just that; Chang was uncertain of his colleagues' true intentions. A.R. 112-13, 115-16, 122. Chang was thus forced to choose between fulfilling his duty under Chinese law by reporting his suspicions to the Chinese Embassy, thus causing possibly undeserved problems for his colleagues, and respecting his loyalty to

25

his colleagues by keeping quiet until and unless he became sure of their plans.

Chang testified that he decided not to inform on his colleagues without better information. A.R. 113, 115-16 (Chang's testimony that "[he wouldn't] like to do this" before he obtained "new evidence" to "make sure" of their intentions). This was certainly a humane and understandable decision. But, contrary to the majority's conclusion, there is no evidence that it was a political decision. According to the majority, a reasonable factfinder would be compelled to find that "Chang failed to report his fellow delegates based solely on his disagreement with the punishment that they were likely to face at the hands of the Chinese government." Maj. Op. at 13. The majority holds that Chang "manifested opposition to the Chinese government" by "defying the orders of the Chinese government because he disagreed with how they would treat those suspected of trying to defect." Maj. Op. at 14. These conclusions are belied by Chang's own testimony.

At no time has Chang said that he opposes the Chinese law prohibiting defection; at no time has Chang said that he opposes the punishment that his colleagues would have faced if he had reported them; and at no time has Chang said that he opposes the Chinese government's requirement that a delegation leader surveill his fellow delegees. Indeed, so far as the record reflects, Chang has never articulated any political opinion at odds with the Chinese government.

Rather, his testimony makes it clear that his unwillingness to report his colleagues was based solely on his uncertainty regarding their true intentions. As Chang explains in his brief, he

made a conscious choice not to contact the Embassy. He reasoned that he did not want to report the individual unless he was absolutely sure of his intentions. In the event that he chose to report an[ ] individual to the government, that individual would suffer severe repercussions. He did not want to cause any problems for individuals who may be otherwise innocent.

26

Petitioner's Br. at 7 (emphasis added). See also A.R. 12 (same; Chang's brief before the BIA); A.R. 115-17 (Chang's testimony that "[he wouldn't] like to -- to report them to the Chinese embassy" "before [he could] make clear" their true intentions); A.R. 122 (Chang's testimony that it was "hard . . . to make a decision" because there was "no way to make -- make sure" of his colleagues' plans); A.R. 113.

Rather than representing political opposition to China's state security law, Chang's conduct simply reflects a concern for accuracy in its enforcement. See Chang Br. at 31 (Chang's conduct was intended "to avoid false accusations of an otherwise innocent individual"). Such a concern is honorable, but I fail to see how it compels the factual conclusion that Chang "defied" the Chinese government because he held a political opinion contrary to the state security law.10 Accordingly, I dissent.

_____

10. The majority holds that, for a variety of reasons, the evidence compels the conclusion that China's motive in prosecuting Chang for violating the state security law is, in part, political. Maj. Op. at 15-16. Because of its conclusion that Chang's conduct was based "on political grounds," the majority does not need to reach the question whether an asylum applicant can show the requisite fear of persecution "on account of . . . political opinion" where he in fact has manifested no political opinion but his home country's government erroneously imputes to him a disfavored political opinion. See Maj. Op. at 17 n.7. I am not aware of any case in which an asylum applicant prevailed on a claim of "persecution" on account of "political opinion" where he did not hold any political opinion at odds with his home country's government and did not present any evidence that his home country's government had attributed a specific political opinion to him.

In Rodriguez-Roman v. INS, 98 F.3d 416 (9th Cir. 1996), the court held that in order to show that prosecution for unlawful departure constitutes "persecution," the applicant "must prove that he is one of the persons at whom the illegal departure statute was directed-- persons who flee their homeland for political reasons." Id. at 430 (citations omitted). See also id. at 426. The majority endorses the proposition that "if the asylum-seeker's motives in leaving his or her country were `related' to `political opinion' . . . prosecution under [unlawful departure laws] can constitute persecution." Maj. Op. at 11. However, the majority errs in applying it to

27

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit
_____

this case, because, as I have explained in the text, there is no evidence that Chang's conduct was based on any political opinion.

Moreover, courts accepting the "imputed opinion" theory have not merely presumed that a foreign government has attributed a political opinion to the applicant; rather, they have required that the applicant actually "produce[ ] evidence of such a mistaken imputation." Chen v. INS, 95 F.3d 801, 806 (9th Cir. 1996). See Singh v. Ilchert, 69 F.3d 375, 379 (9th Cir. 1995) (relying on evidence that "the police imputed to Singh the beliefs of the Sikh separatists and harmed him on that basis"); Singh v. Ilchert, 63 F.3d 1501, 1509 (9th Cir. 1995) (relying on evidence that the applicant was tortured because he was suspected of being a Sikh separatist); Desir v. Ilchert, 840 F.2d 723, 729 (9th Cir. 1988) (relying on evidence that the Ton Ton Macoutes "attributed subversive views" to Desir). Under Elias-Zacarias the fact that the Chinese government may have a political motive in prosecuting Chang does not show that the prosecution would be "on account of " Chang's "political opinion." See 502 U.S. at 482. And Chang did not present evidence sufficient to compel the conclusion that the Chinese government has imputed a political opinion to him. See id. ("Nor is there any indication (assuming, arguendo, it would suffice) that the guerrillas erroneously believed that Elias-Zacarias' refusal was politically based").

28