**Lin GAO, Petitioner,**

v.

**John ASHCROFT, Attorney General of the United States, Respondent.**

No. 03–1540.

United States Court of Appeals, Third Circuit.

Submitted Pursuant to Third Circuit LAR 34.1(a) Feb. 12, 2004.

Decided March 8, 2004.

---

Eleanor H. Chen, Philadelphia, PA, for Petitioner.

Donald E. Keener, John J. Andre, Douglas E. Ginsburg, John M. McAdams, Jr., United States Department of Justice, Office of Immigration Litigation, Washington, DC, for Respondent.

Before SCIRICA, Chief Judge ROTH, and McKEE, Circuit Judges.

1. Effective March 1, 2003, the INS ceased to exist, and its interior enforcement functions were transferred to the Department of Homeland Security, Bureau of Immigration and Customs Enforcement. *See* Homeland Security Act, 116 Stat. 2135 Pub.L. 107–296 § 441 (2002).

## OPINION

McKEE, Circuit Judge.

Lin Gao petitions for review of the Board of Immigration Appeals' ("BIA") order requiring his voluntary departure from the United States. Because we find that the BIA's decision is supported by substantial evidence, the decision will be affirmed.

### I.

Gao is a native and citizen of the People's Republic of China. Administrative Record ("A.R.") 316. He arrived in the United States on May 10, 1997 and presented a fraudulent Chinese passport to Immigration and Nationalization Service ("INS")[1] inspectors. A.R. 160. When the inspectors discovered that the passport was a fake, Gao confessed his true identity, but continued to lie about his age. Gao was subsequently placed into removal proceedings. A.R. 389–90.

On August 5, 1998, Gao submitted an application for asylum and withholding of removal." A.R. 320–27. As part of the application, Gao also submitted an affidavit stating the facts of his claim. A.R. 316–19. Gao asserted that he was born on April 17, 1979 in Changle County, Fujian Province, People's Republic of China. He is the eldest of three children. A.R. 316. After the birth of his first brother in 1981, population control officials ordered Gao's mother to use an Intrauterine Device as a method of birth control. Instead of complying with the government's order, his parents decided to move away from Changle County to avoid population control officials. A.R. 316–17. Later that year, pop-

ulation control officials came to Gao's grandparents' house in search of his parents. When his grandparents indicated that they did know where Gao's parents were, the officials "demolished [their] house, and confiscated [their] furniture and other valuables." A.R. 317.

The affidavit further stated that Gao's second brother was born in 1983. The family moved several times during the next 13 years in order to avoid detection by population control officials so that Gao could attend school. A.R. 317. In 1996, however, his parents decided to move back to Changle County. *Id.* Shortly thereafter, local population control officials came to the family's home and took Gao's mother to Changle County Hospital for sterilization. A.R. 318. After learning of what happened to his mother, Gao went to the local population control office and protested China's policy on population control. He asked the officials "why they did this to [his] mother" and stated that the "birth control policy was inhuman." *Id.* In reaction to his protest, the officials "became very irritated," and Gao was detained "in a very small room in the village government building." *Id.* He was released one week later when his parents agreed to pay of fine of 10,000 Yuan. The fine was imposed for his opposition to China's population control policy as well as his parents' violation of said policy. *Id.* Gao also stated that before he was released, population control officials indicated that he "would be put in jail again if they found out that [he] was still resistant to the enforcement of the birth control policy." A.R. 319. As a result of this experience, and with the help of family and friends, Gao fled to the United States. Finally, Gao stated that he feared returning to China because he believed he would be subjected to further persecution based on his opposition to the country's population control policy. A.R. 319.

During his hearing before the Immigration Court, Gao reasserted his application for asylum and withholding of removal and also sought relief under the Convention Against Torture ("CAT"). A.R. 69. Although Gao testified that everything he stated in his earlier affidavit was true (A.R.82), he added several additional facts during his testimony. First, he testified that when population control officials came to take his mother to the hospital for sterilization, he "rushed to them, and ... was pushed onto the ground." A.R. 97. Later, he testified that he initiated an altercation with population control official when he went to their office to protest his mother's serialization. A.R. 131.

The IJ found that Gao's claim failed for lack of credibility. A.R. 29. Specifically, he noted that:

(1) Gao presented a false passport to INS inspectors;

(2) Gao continued to lie about his age, even after INS inspectors determined that his passport was fraudulent;

(3) Gao did not mention that he was jailed for his views on China's population control policy prior to his testimony before the Immigration Court;

(4) Gao did not mention that he initiated an altercation with population control officials prior to his testimony before the Immigration Court;

(5) Gao's testimony regarding his encounters with population control officials was inconsistent;

(6) there was no evidence that Gao had any interest in China's population control policy either before or after his mother's sterilization; and

(7) there was no evidence that population control officials had any adverse interest in Gao during the nine

months he lived in China following his arrest. A.R. 30–32. Therefore, the IJ denied Gao's applications for asylum and withholding of removal and relief under the CAT. A.R. 34. However, Gao was permitted to depart the country voluntarily.

On January 28, 2003, the BIA issued a *per curium* order affirming the IJ's decision without opinion pursuant 8 C.F.R. § 1003.1(e)(4), thereby making the IJ's decision the final agency determination. A.R. 2. This appeal followed.

## II.

The Attorney General has the discretion to grant asylum to an alien who qualifies as a "refugee." 8 U.S.C. § 1158(b). The Immigration and Nationalization Act defines a "refugee" as:

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A). In order to meet this standard, an alien must "show that he has a subjective fear of persecution that is supported by objective evidence that persecution is a reasonable possibility." *Chang v. INS*, 119 F.3d 1055, 1166 (3d Cir.1997). However, an alien does not have to show clear probability of persecution. As the Supreme Court noted in *INS v. Cardoza–Fonseca*, 480 U.S. 421, 431, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987), "[o]ne can certainly have a well-founded fear of an event happening when there is less than a 50% chance of the occurrence taking place." If an alien establishes that he or she suffered past persecution, a rebuttable presumption arises that he or she has a well-founded fear of persecution in the future. 8 C.F.R. § 208.13(b)(1).

In order to withstand appellate review, the agency decision must be supported by "substantial evidence." *Balasubramanrim v. INS*, 143 F.3d 157, 161 (3d Cir. 1998). "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion...." *N.L.R.B. v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300, 59 S.Ct. 501, 83 L.Ed. 660 (1939) (citation and internal quotation marks omitted). In other words, "the administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary...." 8 U.S.C. § 1252(b)(4)(B).

With these standards in mind, we now consider the IJ's decision, which became the final agency determination. As an initial matter, we must note that the IJ makes several misstatements of fact in his decision. First, he stated that "[i]t was not until [Gao] testified in the Immigration Court in the year 2000 and 2001, several years after he arrived in the United States, that he alleged that he had been jailed in China because of [his] opposition to the birth control policy." A.R. 31. This is simply not true. In his 1998 asylum application, Gao indicated that he was has detained and fined because of his "resistance to the birth control policy...." A.R. 318. He also stated that population control officials threatened to arrest him again if they found out that he "was still resistant to the enforcement of the birth control policy." A.R. 319. Thus, the record clearly reflects that Gao claimed that he was arrested for his opinion on China's population control policy prior to his testi-

mony before the Immigration Court. Second, the IJ found that Gao's testimony regarding his altercations with birth control officials were inconsistent. Specifically, the IJ stated: "[a]t one point [Gao] testified that he assaulted the birth control official when [the official] came to the family home to take his mother for sterilization. Later in his testimony, however, [Gao] claimed that he assaulted the birth control official at the office of the birth control cadre." A.R. 31. Again, this is a misstatement of the record. At one point during the hearing, Gao testified that when the population control officials came to take his mother for sterilization he "rushed to them, and ... was pushed onto the ground." A.R. 97. Later, he claimed that he *also* initiated a physical alteration with population control officials at their office. A.R. 131 ("I pushed them down. That was [what] happened in the office of the family...."). Thus, it is clear that Gao was referring to two separate altercations, and that his testimony was not inconsistent in this regard.

However, despite these misstatements of fact, we must still determine whether the additional bases for the IJ's decision are sufficient to meet the substantial evidence standard. To begin, Gao admitted presenting a false passport to INS inspectors when he arrived in the United States. Even after the inspectors determined that the passport was fraudulent, he continued to lie about his age. Moreover, Gao did not mention either of his alleged altercations with population control officials in his asylum application, instead waiting until he testified before the Immigration Court. When the IJ questioned him about the lack of detail in his asylum application, Gao testified: "If I had to go through every

step-every motion like that, then I should go to make a movie to present to the Court." A.R. 133. Later, he testified that he simply "forgot" to include these incidents in his asylum application. *Id.* Finally, Gao presented no evidence that he had any interest in China's population control policies either before or after his mother's sterilization. In fact, Gao remained in China for nine months after his arrest and had no further encounters with population control officials. Given these facts, which are essentially undisputed, we find that there is substantial evidence to support the IJ's finding that Gao was not credible with respect to his claim that he was persecuted for his opposition to China's birth control policy.[2]

### III.

Based on the foregoing analysis, we will affirm the BIA's decision.

---

**2.** Because Gao does not meet the standard for asylum relief, there is no need to consider his applications for withholding of removal and relief under the CAT, both of which require a

higher likelihood of persecution. *Chang,* 119 F.3d at 1059; 8 C.F.R. §§ 208.16(c)(2) and (4).