OPINION OF THE COURT
RENDELL, Circuit Judge.
Long Hao Li, a citizen and national of China who is ethnically Korean, seeks withholding of removal based on his fear of persecution for violating Chinese laws forbidding citizens from providing assistance to illegal immigrants from North Korea. Li presented testimony that he assisted North Korean refugees, that Chinese authorities sought to arrest him, and that he fled to the United States to avoid arrest. Li concedes that he violated Chinese law, but argues that his arrest and prosecution for that violation would amount to persecution “because of’ his political opinion, thus satisfying the requirements for withholding of removal.
Under our precedent, prosecution under a generally applicable law can provide the basis for withholding of removal, but only where the petitioner establishes a connection between the prosecution and his or her political opinion, such that the persecution (if shown) would be “because of’ that opinion. In this case, the law at issue is a *138 generally applicable law that penalizes people for assisting those who cross the border illegally. It does not automatically raise political concerns. Moreover, Li has not offered any specific evidence concerning his political opinions, the Chinese government’s awareness of those political opinions, or the nature of the government’s enforcement of the law that would raise suspicion that the prosecution of Li for violating that law would relate to a political opinion. Because Li failed to adduce evidence that raises an inference of political persecution, as opposed to legitimate prosecution under Chinese law, and because substantial evidence supports the BIA’s determination that Li failed to establish a clear probability of persecution, we will deny his petition for review.
I.
Li entered the United States without authorization at an undetermined date and location. On April 20, 2007, he applied for asylum, withholding of removal under 8 U.S.C. § 1231(b)(3), and protection under the Convention Against Torture. Li claimed that he would be arrested and jailed for helping North Korean refugees cross the border into China if he returned to China. Li conceded that his conduct was illegal under Chinese law.
To support his application, Li submitted: an affidavit describing the particulars of his claims; various forms of identification establishing certain biographical facts; an affidavit from his wife attesting to circumstances surrounding his arrival in New Jersey; a translated letter from his mother, who still lives in China, stating: “All you did was to help pitiful people who were in awkward position. How can it be such a crime that police is after you to arrest”; a two-page article from an organization called “HighBeam Research” and a report from a non-governmental organization called the International Crisis Group describing the plight of North Koreans who try to escape from North Korea, including those who cross the border into China; and an excerpt of a China “Country of Origin Information Report” published by the United Kingdom Home Office Border & Immigration Agency.
Among these materials, only the Home Office report provides any detail regarding the consequences for those who assist North Korean refugees, as opposed to the refugees themselves. Quoting what appears to be a 2006 United States State Department Report, the Home Office report states:
“(However), the [Chinese] government continued to deny the UNHCR permission to operate along its northeastern border with North Korea, arguing that North Koreans who crossed the border were illegal economic migrants, not refugees. During the year several thousand North Koreans were reportedly detained and forcibly returned to North Korea. Many faced persecution, and some may have been executed upon their return. Several hundred North Koreans were permitted to travel to third countries after they had entered diplomatic compounds or international schools in the country. There were numerous credible reports of harassment and detention of North Koreans in the country. The government also arrested and detained foreign journalists, missionaries, and activists, as well as some citizens, for providing food, shelter, transportation, and other assistance to North Koreans.”
A.R. 207 (emphasis added).
The Immigration Judge held a merits hearing on Li’s claims on February 1, *139 2008.[1] As relevant here, Li testified regarding his “main purpose” in coming to the United States as follows: “[i]f I had stayed in China I’ll be arrested by the police and sentenced to serve time in jail ...” because “I did something illegal.” A.R. 128-29. When asked what he did that was illegal, Li testified, “I help a lot of refugees from North Korea. Help them ... smuggle to the United States.” A.R. 157. Specifically, Li explained that, over the course of a two-year period, he drove to the Chinese border with North Korea, where he picked up North Korean refugees crossing the river into China and transported them in his car or his company’s minivan to a person who would arrange food, shelter, and work for the refugees. A.R. 160-64.
Li testified, further, that he left China after an incident at the border in May 2006. Li drove his car to the border crossing to pick up refugees. As he waited in his car, Li watched the police descend and arrest the refugees and Li’s colleague, who was bringing the refugees to Li’s car. Li fled the scene in his car and, later, abandoned his car and returned to the city by taxi. Fearing arrest, he did not return home; instead, he hid at a friend’s house for ten days before deciding to come to the United States. Li testified that his colleague was sentenced to ten years in jail in connection with this incident and that, shortly thereafter, his contact who helped provide food, shelter, and work for the refugees also was arrested. Li testified that his mother told him that authorities visited her house and intended to arrest him, too. A.R. 164-68.
In an oral decision at the conclusion of the merits hearing, the IJ granted statutory withholding of removal to Li.[2] The IJ summarized the “literature” regarding the Chinese government’s policy of returning North Korean immigrants to North Korea and North Korea’s treatment of returning refugees, opining that “the government of North Korea is in some cases punishing some of these individuals in a manner that is not associated by the fact that they had violated immigration laws. An assessment of a sentence or hard work or labor for such a violation clearly offends the analysis of the Court.” A.R. 85. Apparently referring to the Home Office report quoted above, he continued, “one of the last analysis by the Department of State of the United States they admit that the main action or the main directive by the People’s Republic of China is to individuals that are assisting in this type of operation on the other side of the fence and that will be the respondent.” Id. The IJ concluded that Li had met the standard for statutory withholding because, “assuming that the police apparently knows about his operation and the use of private equipment from his company in the operation of smuggling these citizens of North Korea may be or may resolve in some severe punishment to him that could affect his liberty or even his life.” A.R.86.
The Board of Immigration Appeals reversed, for two reasons. First, the BIA held that Li failed to establish a sufficient *140 nexus between his fear of persecution and his political opinion. Noting Li’s admission that he acted illegally in helping refugees enter China and his failure to “establish[] that the Chinese government’s prohibition of such smuggling is based on an enumerated ground,” the BIA concluded that Li “faces being the subject of a legitimate government investigation, and could be legitimately detained and/or prosecuted for a crime, which is not persecution.” A.R. 4 (citing Chang v. INS, 119 F.3d 1055 (3d Cir.1997)). Second, the BIA concluded that Li failed to establish “a clear probability of persecution.” It stated that Li “did not show that the Chinese government was aware that he was involved in the smuggling operation and still maintained an interest in persecuting him because of his involvement.” A.R. 4.
II.
Li’s petition for review challenges both the BIA’s determination that Li failed to demonstrate a likelihood of persecution on account of his political opinion and its conclusion that he failed to establish a clear probability of persecution.
We have jurisdiction to review a final order of removal under 8 U.S.C. § 1252(a)(1). Where, as here, our review “does not turn on any novel legal interpretation by the [BIA] and instead involves the [BIA]’s fact-finding and application of established legal standards, we will reverse the [BIA]’s decision to deny ... withholding of [removal] ‘only if a reasonable fact-finder would have to conclude that the requisite fear of persecution existed.’ ” Lin v. INS, 238 F.3d 239, 243 (3d Cir.2001) (quoting Chang, 119 F.3d at 1060); see also 8 U.S.C. § 1252(b)(4)(B) (“[Administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.”); INS v. Elias-Zacarias, 502 U.S. 478, 483-84, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992) (“[I]f [an ahen] seeks to obtain judicial reversal of the BIA’s determination, he must show that the evidence he presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution.”).
Before considering the merits of Li’s petition, we briefly review the standard for statutory withholding of removal, the only substantive claim remaining in this case.[3] The INA provides that “the Attorney General may not remove an alien to a country if the Attorney General decides that the alien’s life or freedom would be threatened in that country because of the alien’s race, religion, nationality, membership in a particular social group, or political opinion.” 8 U.S.C. § 1231(b)(3)(A). This standard is similar to, but more stringent than, the standard for asylum. Whereas an asylum applicant need only establish a “well-founded fear” of persecution, a withholding applicant must establish a “clear probability” that his life or freedom would be threatened .because of an enumerated characteristic. “ ‘Clear probability’ means that it is ‘more likely than not’ that an alien would be subject to persecution.” Zubeda v. Ashcroft, 333 F.3d 463, 469 (3d Cir.2003) (quoting INS v. Stevic, 467 U.S. 407, 429-30, 104 S.Ct. 2489, 81 L.Ed.2d 321 *141 (1984)). Unlike asylum, withholding of removal is a mandatory remedy; once an alien carries his or her burden to establish a clear probability of persecution on account of an enumerated ground, see 8 C.F.R. § 1208.16, the Attorney General must grant the relief, see Zubeda, 833 F.3d at 469.
III.
Li first argues that the BIA erred in concluding that he failed to establish that any persecution he might face in China is “because of’ his political opinion. Li concedes that he violated a generally applicable Chinese law, but argues that, by helping North Korean refugees, he was engaged in a “quintessentially political gesture.” Pet.’s Br. 11. Without citing any material in the record, he asserts in his brief that, “[g]iven China’s generally abysmal human rights record, and its specifically harsh handling of the Korean refugee situation, there is no question that any actions to be taken by the Chinese government against Li would be political in nature, against someone who has, through his acts, defied China’s ongoing efforts to circumvent international human rights and refugee law.” Id.
The question before us is not whether the Chinese government’s prosecution for the violation of a generally applicable law under these circumstances could provide the basis for a withholding of removal claim — our caselaw, which the BIA cited and applied, plainly establishes that it could. The real question is whether Li provided sufficient record evidence to establish that, in his case, prosecution would be on account of his political opinion. We agree with the BIA that he did not. At the very least, the evidence Li provided certainly would not compel any reasonable factfinder to reach a conclusion contrary to that of the BIA.
A.
The BIA correctly identified the standard for establishing withholding of removal based on a violation of a generally applicable law. “As a general matter, ... we have held that fear of prosecution for violations of ‘fairly administered laws’ does not itself qualify one as a ‘refugee’ or make one eligible for withholding of [removal].” Chang v. INS, 119 F.3d 1055, 1060 (3d Cir.1997) (citations omitted). As the BIA recognized, however, “under certain circumstances, prosecution under laws of general applicability may provide the basis for withholding of removal.” A.R. 4 (citing Chang, 119 F.3d at 1060). “To provide a basis for withholding of removal, a generally-applicable law must be based on an enumerated ground and the punishment must be sufficiently extreme to constitute persecution.” A.R. 4 (citing Chang, 119 F.3d at 1061).
Of course, simply articulating the appropriate standard does not end the analysis. The next step is to determine whether the law or the Chinese government’s enforcement of it is “based on” Li’s political opinion. An alien need not “provide direct proof of his persecutors’ motives.” Elias-Zacarias, 502 U.S. at 483, 112 S.Ct. 812. “But since the statute makes motive critical, he must provide some evidence of it, direct or circumstantial.” Id. We have previously observed that “the nature of the statute being enforced” and “the actions that” the alleged persecutor “sought to compel by that statute” may “help determine the motives of the alleged persecutor.” Chang, 119 F.3d at 1063.
Our opinions in Chang v. INS, 119 F.3d 1055 (3d Cir.1997), and Lin v. INS, 238 F.3d 239 (3d Cir.2001), provide examples of the type of evidentiary showing required to sustain a substantial evidence challenge to a BIA finding that the perse *142 cutor was not motivated by political opinion. In Chang, a chief engineer for a state-owned company led a delegation from China to the United States in 1992. Before the trip, a Chinese special security agent specifically instructed Chang to monitor and report to the Chinese Embassy any suspicious activity by his fellow delegates. Chang declined to do so. After meeting with FBI agents in the United States, who told Chang that, as a result of his actions, he was “in danger” of future mistreatment by the Chinese government, Chang decided to stay and seek asylum in the United States. Id. at 1057-58.
We held that the evidence compelled the conclusion that China’s motive in prosecuting Chang would be “in part, political.”[4] Id. at 1065. A Human Rights Watch/Asia report included in the record and quoted in the opinion stated that “ ‘the principal objective’ ” of China’s Security Law, under which Chang feared prosecution, “ ‘appears to be to frighten dissidents into halting their activities.’ ”[5] Id. at 1064. That evidence was bolstered by a State Department report that indicated continuing political repression in China and Chang’s “unique situation,” specifically the facts that “the Chinese government entrusted him with politically sensitive obligations to limit the freedoms of other delegates” and that he “refused to comply” with those obligations “because he disagreed with the punishment that the government would mete out for violations.” Id. We summarized the evidence as follows: “[Our] conclusion is based on the statute itself, which provides potentially harsh punishment for mere violation of the exit laws, on the responsibilities with which Chang was entrusted, on the appearance of disloyalty and political opposition as a result of Chang’s actions, and on Chang’s actual motivations in breaking China’s laws.” Id.
In Lin, we likewise concluded that the petitioner, also a Chinese citizen, had presented sufficient evidence to warrant a reversal of the BIA’s ruling denying his applications for asylum and withholding of removal. Lin was a fifteen-year-old middle school student when, in 1989, he took a “very active” role in student marches protesting the Chinese government’s “corruption, undemocratic rule, and disregard for human rights” in his native Fujian Province. 238 F.3d at 241. Lin participated in a series of marches in May and June 1989, during which he and others attempted to occupy a county government building and were beaten back by officers and soldiers wielding electric batons. Id. at 241-42. On June 4th, 1989, the student protest movement ended with a massacre of student protesters in Tiananmen Square. Id. at 242.
Lin went into hiding in China and ultimately emigrated to the United States. *143 He presented detailed evidence of his ordeal to support his asylum and withholding of removal claims, including a copy of a subpoena (issued six days after the events in Tiananmen Square, see id. at 245) demanding that Lin appear for interrogation at the Security Section of the Public Security Bureau, testimony that officers visited Lin’s home on six occasions looking for Lin and that they detained Lin’s mother seeking information about his whereabouts, and testimony that Lin’s classmates were arrested, beaten, and sentenced to detention and forced labor for their participation in the student movement. Id. at 242-43. Lin testified, further, that the officers who visited his mother repeatedly mentioned Lin’s involvement in the student movement. Id. at 242.
Reviewing this evidence, we held that the BIA’s conclusion that the police sought to prosecute Lin “only for trespass,” not on account of his political opinion, was “wholly unsupported by the record.” Id. at 244. We based our assessment on Lin’s testimony that police officers specifically referenced his participation in the student democracy movement when they interrogated his mother, the mistreatment to which his classmates were subjected, the government’s interrogation of Lin’s mother and its six visits to his home over a year-and-a-half long period, and the context of the broader, nationwide political repression that followed the Tiananmen massacre. Id. at 244-45.
B.
This case is very different from Chang and Lin. As a preliminary matter, we do not even have enough information to conduct the type of analysis we performed in Chang and Lin. The record does not identify the precise statute or even provide any general information about the law under which Li fears prosecution.[6] All we know is that, by his own admission, Li’s conduct was illegal, A.R. 129, 170, and that, according to a United Kingdom government report of what the United States State Department has said, the Chinese government has ‘“arrested and detained *144 foreign journalists, missionaries, and activists, as well as some citizens, for providing food, shelter, transportation, and other assistance to North Koreans,’ ” A.R. 207. The sum total of those facts — that Chinese law penalizes people who assist others who cross the border illegally — does not automatically raise the same sort of political concerns as the laws involving controls on people leaving the country or political expression implicated in Chang and Lin.
Indeed, in this case, unlike in Chang or Lin, no record evidence suggests that the law’s objective is to silence or punish political dissent. To the contrary, the record suggests that the Chinese government views North Korean immigrants as “illegal economic migrants” and is concerned that “a steady stream of border crossers” could “become a flood, causing economic havoc in the [border] region and possibly stoking latent Korean nationalism there.” A.R. 213-14. Viewed in this light, and without any additional information, a generally applicable Chinese law designed to deter Chinese citizens from assisting North Korean migrants can reasonably be interpreted as a rational policy response to a serious immigration problem, similar to steps that other countries take to protect their own borders. In fact, as the Government pointed out in its brief to the BIA, United States law also provides criminal penalties, including up to ten years in prison, for bringing in, transporting, or harboring aliens in the United States in violation of the immigration laws. See A.R. 46 (citing 8 U.S.C. § 1324).
Nor does Li provide any detail about his own political opinions, about the Chinese government’s awareness of those political opinions, or about the government’s enforcement of the law that compels the conclusion that any prosecution in his case would be politically motivated. Li testified only .that he broke the law by assisting North Korean refugees; that some of his colleagues were arrested and sentenced to ten years in prison for breaking the law; and that police knew about Li’s activities and sought to arrest Li for breaking the law. This evidence is at least as consistent with fear of legitimate prosecution for smuggling as it is with targeted persecution on account of a political opinion.
Li’s testimony did not touch on his motivation to help the North Korean refugees, but the affidavit attached to his asylum application suggests that his concerns were humanitarian. After describing the Chinese government’s policy of deporting North Koreans who enter China illegally, Li stated, “I asked myself, since the Chinese government is unwilling to help, shouldn’t I do my best to assist them?” A.R. 291. Li’s mother also cast his actions in humanitarian terms: “All you did was to help pitiful people who were in awkward position. How can it be such a crime that police is after you to arrest[?]” A.R. 237. We recognize that “a humanitarian or charitable act may signify a humanitarian or charitable conviction; and a government might construe [a] violation of law as opposition or resistance to the law’s underlying policy, and punish it accordingly.” Jin Jin Long v. Holder, 620 F.3d 162, 167 (2d Cir.2010). But surely any prosecution involving a humanitarian act cannot be presumed to be politically motivated. Indeed, without any evidence concerning the government’s motivation in enforcing the law, a government prosecution of a violation of the law would seem to be based on legitimate law enforcement concerns. In this case, Li simply has not provided any facts to suggest that prosecution would be because of any opposition or resistance to the law’s underlying policy, rather than appropriate administration of the law.[7]
*145 Specifically, Li presents none of the indicia of political motivation on the part of the Chinese government that the law requires. We are not presented with the type of “unique situation” involving special government responsibilities and confirmation by the FBI that the petitioner was in a politically precarious position we considered so persuasive in Chang, or evidence that police were seeking to punish the petitioner through beatings or forced labor as a direct consequence of participating in a political demonstration, as we confronted in Lin. Therefore, we cannot conclude, as we must to grant the petition for review, that Li’s evidence is “so compelling that no reasonable factfinder could fail to find the requisite fear of persecution.” Elias-Zacarias, 502 U.S. at 483-84, 112 S.Ct. 812.
C.
At oral argument, Li’s counsel took the position that the Chinese government’s position on North Korean refugees is so abhorrent that withholding of removal should be automatic for any Chinese citizen who helps North Korean refugees and, to some extent, our dissenting colleague suggests the same result.[8] The logical upshot of such a ruling, however, would be that every Chinese citizen who helps North Korean refugees would qualify automatically for asylum or withholding of removal. But our law plainly requires more. As we noted above, absent “some evidence ..., direct or circumstantial” of his persecutors’ motives, an alien may not succeed on an asylum or withholding of removal claim. Elias-Zacarias, 502 U.S. at 483, 112 S.Ct. 812.
Applying that principle, we and other courts of appeals have granted petitions for review in cases involving claims similar to Li's only where the petitioners adduced specific evidence that supported their claims; in the case of asylum or withholding of removal claims, this means specific evidence that at least raises an inference of political persecution. For example, in *146 Jin Jin Long v. Holder, 620 F.3d 162, 167-68 (2d Cir.2010), the Second Circuit Court of Appeals granted a petition for review and ordered the BIA to consider whether facts related to the Chinese petitioner’s previous arrest and detention supported an inference that the petitioner was “persecuted for political reasons, rather than punished for legitimate law enforcement purposes.” There, the evidence showed that, “though neither charged nor presented in court, [the petitioner] was subjected to prolonged detention and physical abuse.” Id. Similarly, in Kang v. Attorney General, 611 F.3d 157, 166-67 (3d Cir.2010), we granted a petition for review and held that the evidence compelled a finding that the petitioner met her burden of establishing a CAT claim where she provided affidavits from similarly situated individuals detailing their detention and torture and testimony and an affidavit concerning police beating and torture of her son to elicit information about the petitioner. And, in Li v. Holder, 559 F.3d 1096, 1111-12 (9th Cir.2009), the Ninth Circuit Court of Appeals granted a petition for review based on the petitioner’s claim that he was persecuted on account of his political opinion for helping North Korean refugees because he provided “direct evidence of officers’ motivation in the record — the officers specifically interrogated Li about why and how he had helped the North Koreans while they were brutalizing him.” Id.
By contrast, in other cases involving Chinese citizens who have assisted North Korean refugees, courts of appeals have not hesitated to deny petitions for review that were not supported by specific evidence raising an inference of political persecution. See, e.g., Jin, 620 F.3d at 168 (holding that petition “fails on the essential ground that there is little (if any) evidence that [alien] acted from a political motive” where alien testified that he “did not believe that assisting North Korean refugees was illegal until after his assistance was completed”; alien acted out of “independently sufficient motive of family loyalty”; and alien, like Li in this case, fled “before encountering the authorities investigating his conduct”); Li, 559 F.3d at 1098 n. 1 (noting that Li’s petition was consolidated with two other petitions involving “Chinese citizen[s] of North Korean descent who [were] allegedly persecuted for giving aid, food, and shelter to North Korean refugees,” and granting relief to only one of the three petitioners). Because Li has not presented any specific evidence of past mistreatment or any details regarding the government’s administration of the law or the arrest and detention of his colleagues that suggest that his prosecution would be anything other than a legitimate prosecution for a violation of the law, his case plainly falls within the latter category.[9]
We emphasize that our decision is based solely on the lack of compelling evidence of a political motive for prosecution in this case. Although we disagree with Li’s counsel that an alien who testifies that he or she assisted North Korean refugees automatically establishes a withholding of removal claim, we certainly do not suggest that a Chinese citizen who has assisted North Korean refugees can never establish *147 such a claim. In each case, the question is whether the alien has provided evidence sufficient to establish an inference that he or she would be persecuted “because of the alien’s ... political opinion.” 8 U.S.C. § 1231(b)(3)(A) (emphasis added). Where, as here, the alien has not adduced such evidence, we will deny his or her petition for review.
IV.
In addition to challenging the BIA’s determination concerning the nexus between his political opinion and his alleged persecution, Li also asserts that the BIA’s determination that he failed to establish a clear probability of persecution is unsupported by substantial evidence. Li barely argues the point in his brief and, because our conclusion with respect to the political opinion issue is dispositive of Li’s petition for review, we only briefly consider this issue here.
As explained above, the “ ‘clear probability’ ” standard for withholding of removal requires an alien to establish that “it is ‘more likely than not’ ” that “the alien would be subject to persecution.” Zubeda, 333 F.3d at 469 (citation omitted). The BIA held that Li failed to establish a “clear probability of persecution” because he “did not show that the Chinese government was aware that he was involved in the smuggling operation and still maintained an interest in persecuting him because of his involvement.” A.R. 4. As the Government conceded at oral argument, Li did provide some testimony and a letter from his mother that indicated that the Chinese authorities sought to arrest him based on his activities with the North Koreans.
Even taking that evidence into account, however, Li cannot show that the record compels a contrary result, as he must to succeed on his petition for review. See Shardar v. Ashcroft, 382 F.3d 318, 323 (3d Cir.2004) (BIA’s determination whether alien has met his burden of proof “will be upheld to the extent it is supported by ‘reasonable, substantial and probative evidence on the record considered as a whole’ ” (citations omitted)). The record discloses only that authorities came looking for Li once, shortly after they arrested his colleague. At the same time, the record also contains evidence that, after he came to the United States, Li contacted the Chinese government, applied for, and received a Chinese passport without any difficulty. See A.R. 182-83. Thus, the record as a whole does not compel the conclusion that police have continued to pursue his case in the several years since he left, or that they would more likely than not seek to persecute him on his return.
V.
For the foregoing reasons, we will deny Li’s petition for review.

. The IJ denied Li’s asylum claim because he found that Li failed to establish that he submitted his application within one year of his arrival in the United States as required under 8 U.S.C. § 1158(a)(2)(B), and the BIA affirmed that decision on appeal. Because Li’s petition for review does not challenge the denial of his asylum claim, we do not consider the facts surrounding that decision.

. The record of the IJ’s oral decision contains some strange phrasing and usage, which may be the result of poor transcription. The quotes used here are reproduced verbatim from that record without editing.

. As noted above; Li's petition for review does not challenge the BIA’s denial of his asylum claim. Although Li's brief contains several stray references to his CAT claim, he has not made any separate arguments concerning that claim or pointed to any evidence that would compel a different result. We therefore conclude that he has waived any diallenge to the' BIA's denial of that claim. See Laborers’ Int’l Union v. Foster Wheeler Corp., 26 F.3d 375, 398 (3d Cir.1994) (“An issue is waived unless a party raises it in its opening brief, and for those purposes ‘a passing reference to an issue ... will not suffice to bring that issue before this court.’ ” (citation omitted)).

. Our analysis in Chang turned in part on our conclusion that Chang needed only to prove that China was motivated "at least in part” by Chang’s political opinion. See 119 F.3d at 1065. That portion of our analysis has since been superseded by REAL ID Act amendments to the INA, which provide that an asylum applicant "must establish that ... political opinion was or will be at least one central reason for persecuting the applicant.” 8 U.S.C. § 1158(b)(1)(B)(i) (emphasis added); see generally Ndayshimiye v. Att’y Gen., 557 F.3d 124, 130 (3d Cir.2009). Under the REAL ID Act standard, an applicant must establish more than that the persecutor is motivated "in part” by a protected ground; "asylum may not be granted if a protected ground is only an 'incidental, tangential, or superficial’ reason for persecution of an asylum applicant.” Id.

. Although we relied in part on the Human Rights Watch/Asia report, we acknowledged that "the use of materials prepared by [a] 'watchdog' organization is not without its problems.” Chang, 119 F.3d at 1064 (citing M.A. v. INS, 899 F.2d 304, 313 (4th Cir.1990)).

. At argument, Li's counsel, apparently relying on Li v. Holder, 559 F.3d 1096, 1110 (9th Cir.2009), argued for the first time that assisting North Koreans who cross the border is not illegal under Chinese law. Numerous factors, including Li's failure to raise that issue before the IJ and BIA and the assertions to the contrary in his brief to this Court, see Pet’r’s Br. 11, preclude us from considering that argument.
Without addressing this waiver problem, our dissenting colleague asserts that this "gap” in the record provides an independent basis for remand, see Dissenting Op. 150-51, because the Government, not Li, bore the burden of producing evidence concerning the applicable Chinese law, see id. at 147. That assertion is contrary to the well established standards that the alien, not the Government, bears the burden of proof on a withholding of removal claim, see Zubeda, 333 F.3d at 469, and that, to "obtain judicial reversal of the BIA’s determination,” an alien "must show that the evidence he presented” to the BIA "was so compelling that no reasonable fact-finder could fail to find the requisite fear of persecution.” Elias-Zacarias, 502 U.S. at 483-84, 112 S.Ct. 812.
The Ninth Circuit Court of Appeals adhered to those standards in Li, when it held that the IJ’s conclusion that Li’s previous detention for assisting North Korean immigrants violated Chinese law was contrary to record evidence in the form of sworn affidavits from two Chinese legal experts that the petitioner had presented to the IJ. 559 F.3d at 1110. Critically, Li presented no similar evidence in this case. In light of the law that governs our review in this area, his failure to provide meaningful information regarding the content of the applicable Chinese law only underscores our conclusions that Li failed to produce sufficient evidence to support his withholding claim and, more to the point, that the record evidence in this case does not compel us to reach a finding contrary to that of the BIA.

. Judge Roth’s assertion that our analysis in this regard "all but abandons Chang," Dissenting Op. 148, is incorrect. Our conclusion in Chang that the petitioner was entitled to asylum and withholding of removal was based on more than a determination that Chang acted out of a humanitarian instinct; we also considered record evidence concerning the specific Chinese law at issue, State Department and private human rights reports bolstering Chang’s claims, and the unique features of Chang’s situation that, taken together, established that the Chinese government’s motivation for prosecuting Chang was "in part, political.” See Chang, 119 F.3d at 1064—65. No such evidence bolsters Li's claim in this case.

. To be sure, the dissenting opinion asserts that the record "compels” the conclusion that Li’s "humanitarian interest in assisting North Korean refugees” was "at least one central ground for the Chinese government's attempt to arrest him” because it concludes that the record shows that "China’s treatment of immigration by North Koreans and assistance to such immigrants is harsh, politicized, and far from evenhanded.” Dissenting Op. 151, 152. But we are unwilling to conclude that China’s enforcement of its immigration laws is "harsh, politicized, and far from evenhanded” simply because China may previously have imposed less severe penalties for violations of the law. See id. 151-52 (citing fact that penalties for assisting with North Korean immigration increased from relatively modest fines to jail sentences of up to ten years as evidence of "disproportionately severe punishment”). For all we know based on this record, the Chinese government could have responded to the escalating crisis of North Korean immigration by increasing the applicable legal penalties for assisting with such immigration. The record simply does not provide us with sufficient information to conclude (let alone for us to find that the record compels the conclusion) that the increased penalties flow from unfair administration of the law.

. We would agree with Judge Roth’s view that the case should be remanded to consider whether the prosecution Li fears is a mere pretext for persecution, see Dissenting Op. 151-52, but for the fact that it was Li's burden to prove his claim, see Zubeda, 333 F.3d at 469. Li conceded the existence of the law, and he neither made any argument nor adduced any proof to suggest that the law was pretextual as applied to him. These facts distinguish Li's case from the Second Circuit’s decision in Jin Jin Long v. Holder, 620 F.3d 162, 164 (2d Cir.2010), and the Ninth Circuit’s decision in Li v. Holder, 559 F.3d 1096 (9th Cir.2009). See supra 146.