**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-2228
_____

SHAOMEI DONG,
                                        Petitioner

v.

ATTORNEY GENERAL OF THE
UNITED STATES OF AMERICA,
                                        Respondent

_____

On Petition for Review of an Order of the
Board of Immigration Appeals
(Agency No. A200-036-426)
Immigration Judge:  Honorable Margaret Reichenberg
_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
November 2, 2011

Before:  CHAGARES, VANASKIE and STAPLETON, Circuit Judges

(Opinion filed: November 10, 2011)
_____

OPINION
_____

PER CURIAM

Shaomei Dong petitions for review of a Board of Immigration Appeals (BIA)

decision that, based on an adverse credibility determination entered by an Immigration

Judge (IJ), rejected her application for asylum, withholding of removal, and protection under the United Nations' Convention Against Torture (CAT). Having conducted careful review of the relevant record evidence, we will grant the petition for review and remand for further administrative proceedings.

I.

Dong, who hails from the Lianjiang region of China, entered the United States without inspection near Hidalgo, Texas in September of 2005. She was swiftly apprehended and issued a Notice to Appear. Administrative Record (A.R. ) 461–62. In a December 6, 2005 hearing in Newark, New Jersey, in front of now-retired IJ Daniel A. Meisner, Dong conceded removability and announced her intention to file an application for asylum and associated relief. A.R. 51. The application was timely filed in August of 2006. A.R. 448–60. Following several false starts, which yielded more than two years of delay, a merits hearing before IJ Margaret Reichenberg was held with the assistance of a translator on April 29, 2009.

Dong's story, which she developed at this hearing, began in 1999, when anti-Falun-Gong sentiment reached her school in Lianjiang; told that Falun Gong was an "evil cult," she was warned not to associate with the movement. A.R. 452. Later, in 2003, Dong encountered an old friend whom she remembered as a walking exemplar of poor health and foul habits. Much to her astonishment, he was markedly transformed and credited Falun Gong with his improvement. A.R. 459. Dong became interested in the plight of Falun Gong practitioners, and helped her friend distribute flyers while speaking

2

of the mistreatment of Falun Gong members to fellow villagers. A.R. 452, 460. But in June 2004, Dong's activities drew the attention of authorities, who arrested her, beat her severely enough to require brief hospitalization, and warned her to cease her Falun Gong advocacy. In the aftermath of her beating, she became more resolute, leading to friction in her marriage and divorce from her anti-Falun-Gong husband. A.R. 460. Despite this turn of events, Dong continued to support Falun Gong. In May 2005, she was arrested again, beaten, and held by the village cadres. A.R. 453; see also A.R. 107–14. They demanded a list of names of Falun Gong practitioners within three days as a condition of Dong's release from custody and imposed a 2,000 Yuan fine. A.R. 115–16, 453, 460. Fearing for her safety, Dong fled, and upon hearing from her family that the authorities were visiting her home, A.R. 118, 129, she left China for Holland and then Mexico, before crossing over into the United States.

In support of her testimony, Dong submitted numerous exhibits. The first was an affidavit from Bao Jia Yang, the friend she met in 2003, who substantially corroborated her story of mistreatment in China. A.R. 314–15. The second was an affidavit from her father, who described his daughter as being "still young, and . . . not cautious," as she "told the truth in public that the Chinese government was suppressing Falun Gong followers." A.R. 302. Dong's father also revealed that, after she left, "Government cadres came to our home every . . . few days, want[ing] to arrest my daughter and jail her." A.R. 303. The third submission was a police warning dated September 30, 2005 (after Dong's departure from China), stating in translation: "Dong Shaomei of this village

3

still wants to practice and propaganda [*sic*] evil cult Falun Gong. Even after the government's warning, she is still unregenerate. It is now imperative to inform her family and to inform her that Dong Shaomei surrender herself immediately to the police station. If not, she will be punished severely and she will be responsible for [] all consequences." A.R. 265. Finally, Dong included two hospital records from June 2004 (after the first beating), and a "Notice of Fine" stemming from the second incident. A.R. 259, 262, 256. Also attached were visual exhibits and photographs of Dong at Falun Gong rallies and events, as she had since begun to practice Falun Gong (as opposed to merely supporting it) in the United States. A.R. 288–92.

The story as detailed above and as elicited at the 2009 hearing differed in several respects from the version reported on Dong's I-598 asylum application. Several additional details—such as her hospitalization, for example—were not discussed in her I-598 statement.

During the hearing, the IJ was troubled by what appeared to be inconsistencies and implausibilities in Dong's tale.[1] The IJ wanted to know why Dong did not practice Falun Gong in China. A.R. 121–22. Dong responded that she didn't "have a good teacher" in China, had no complaints about her health at the time, and was afraid of *more* severe reprisals from the government cadres. A.R. 121–22. Much discussion also focused on

---

[1] While much in the way of nuance, subtlety, and tone can be lost on the printed page, we should note that the transcripts of Dong's hearings appear to reflect proceedings that were unusually tense, exacerbated by administrative errors by counsel, A.R. 75, and ongoing problems with translation, e.g., A.R. 81–83.

the aforementioned omissions in her I-598 application—specifically, her failure to mention her stay at the hospital, and her failure to discuss her year-long practice of Falun Gong in the United States at the time of filing. A.R. 144. For the most part, Dong attributed those omissions to her desire not to worry her family members, see A.R. 142, although she also seemed to suggest that she simply forgot to include that information, see A.R. 146.

The IJ also expressed frustration with Dong's choice of witness to demonstrate her Falun Gong practice in the United States. Fa Qi Ni, a friend of the family who now lived in New York, had submitted an affidavit in which he claimed to be familiar with Dong's Falun Gong activities.[2] Dong intended to present Ni's live testimony to that effect. But the IJ attacked his credentials, doubting his ability to judge whether Dong was practicing Falun Gong because he was not himself a Falun Gong practitioner. A.R. 140. The IJ asked why Dong had not bothered to submit more evidence of her affiliation with Falun Gong groups and activities, to which she said "I didn't know it's necessary." A.R. 149. Dong explained that she did not keep in touch with many of her Falun Gong co-practitioners, that they were quite busy, and that many "don't want too many people to know that they practice Falun Gong." A.R. 150. At the point when the witness was to be called, the following exchange took place:

Q: Counsel, are we hearing from the brother's friend?

---

[2] We note, too, that Ni's affidavit suggests that he thought Dong practiced Falun Gong in China as well, which is otherwise at odds with the record as developed. The parties have not addressed this inconsistency.

5

A: We can.
Q: *Sure we can hear him tell us how he doesn't know anything about Falun Gong and all he knows is what she told him, and she has a disk.*
A: We don't really think so.
. . .
Q: It is up to you, ma'am, whether you want him to testify or not.
A: I mean, I can bring him but I don't understand the point of the Court.
Q: She provided zero foundation for him knowing anything. He is her father's friend who sees her once in a while, she tells him she is practicing Falun Gong, and he may have seen a disk playing in her house.
A: That is fine, Your Honor, we don't have to bring him as a witness.
Q: It is up to you, ma'am, I am not preventing you, if you want him, get him in now because we are going ahead right away.

A.R. 152–53 (emphasis added). Dong declined, in the end, to call Ni.

The IJ reserved her decision, but eventually denied Dong's application for asylum. The IJ focused mostly on what she deemed to be inconsistencies between Dong's application and her testimony, and her failure to reasonably explain these gaps; Dong's attempts to do so were "unpersuasive and illogical." A.R. 45–46. Further, "[h]er claim that the cadre accepted her explanation that she did not know the full name of the person from whom she got the Falun Gong flyers she was arrested for distributing was not believable," and she was "unable to believably articulate how she could evaluate the level of her friend's Falun Gong expertise or why it was not possible to go with him to learn as he had learned Falun Gong." A.R. 46. The IJ also described this as "not plausible." A.R. 46. Lastly, the IJ held that Dong had "also failed to present reasonably available corroborative documents" relating to her United States practice of Falun Gong. A.R. 46. The IJ concluded: "For these reasons, the respondent was not a credible and persuasive witness. She has failed to meet her burden of proof and persuasion that she suffered past

6

persecution in China because of her association with Falun Gong or that she has a well founded fear that she would be persecuted upon her return for that reason." A.R. 46. As Dong had failed to meet the threshold for asylum relief, her withholding claim was denied as well. A.R. 47. The IJ further found that Dong's failure to testify credibly meant that she had failed to show "that it is more likely than not that she would be tortured in the future," and thus denied the CAT claim. A.R. 47.

With the assistance of counsel, Dong took a timely appeal to the BIA. She primarily attacked the IJ's credibility determination, observing that the supposed inconsistencies between her testimony and her I-589 application were, in general, better characterized as slight omissions or simple ambiguities exacerbated by translation difficulties. Dong argued that the IJ's reasoning in denying the application "border[ed] on being speculative." A.R. 14. Dong also pointed to the numerous exhibits that corroborated her story, and that otherwise bolstered the veracity of the "new" material omitted from the I-589: "all documents submitted by the respondent were admitted into the record with no objections . . . [and] are perfectly consistent with Ms. Dong's claim that she was beaten and suffered injuries to her face and body and suffered headaches as a result." A.R. 12. With regard to her United States practice of Falun Gong, Dong insisted that she *had* presented evidence corroborating her story, in the form of the potential witness and exhibits. Moreover, she denied that her answers to the IJ's questions were inherently unbelievable, and noted that "[h]er claim was not that she had been persecuted because she had practiced Falun Gong in China but rather that she had supported Falun

Gong and had overtly expressed her anti-government opinion in China. ” A.R. 17. She also explained that it was by no means inconsistent for her to support Falun Gong in China while, at the same time, not practice Falun Gong in that country. A.R. 16.

Ultimately, the BIA dismissed the appeal, and declined to review the CAT claim entirely, as Dong had not "meaningfully challenged" that outcome. The BIA determined that the IJ's adverse credibility finding was "not clearly erroneous" because it was "properly based on omissions from the respondent's asylum application of significant aspects of her claim." A.R. 2. It cited several inconsistencies and omissions that supported the IJ's reasoning, such as how the I-589 "omits that she practices Falun Gong in the United States" and "the inherent implausibility of [Dong's] advocacy and support for Falun Gong in China when she had not learned or participated in the practice of Falun Gong in China." A.R. 3. Thus, the BIA concluded that "in the absence of credible testimony, the respondent has not met her burden of proving a well-founded fear of persecution." A.R. 3.

Neither the BIA nor the IJ discussed at any length, in their respective opinions, Dong's documentary submissions. Neither tribunal addressed the police warning document or explained its relevance or lack thereof.

Dong filed a pro se[3] petition for review with this Court. We granted a stay of removal on July 5, 2011, pending briefing and disposition.

---

[3] The Government argues that it is "clear from a cursory reading of the opening brief" that Dong "did not prepare her opening brief and that the brief is ghost-written by an

## II.

We have jurisdiction to review final orders of the BIA. 8 U.S.C. § 1252. When, as here, the BIA "appears to have substantially relied upon the adverse credibility finding of the IJ . . . we have jurisdiction to review both the BIA's and IJ's opinions." Xie v. Ashcroft, 359 F.3d 239, 242 (3d Cir. 2004). Our review is conducted under the substantial-evidence standard, which requires us to uphold administrative findings of fact unless any reasonable adjudicator would be compelled to conclude to the contrary. Lin v. Att'y Gen., 543 F.3d 114, 119 (3d Cir. 2008); see also 8 U.S.C. § 1252(b)(4)(B). We will uphold adverse credibility determinations "if they are supported by reasonable, substantial, and probative evidence on the record considered as a whole." Chukwu v. Att'y Gen., 484 F.3d 185, 189 (3d Cir. 2007) (citations omitted). On the other hand, "[a]dverse credibility determinations based on speculation or conjecture, rather than on evidence in the record, are reversible." Gao v. Ashcroft, 299 F.3d 266, 272 (3d Cir. 2002); see also Sukwanputra v. Gonzales, 434 F.3d 627, 637 (3d Cir. 2006) (reversing

individual with legal training." Br. for Respondent 19 n.5. Therefore, Dong should not be afforded the "undue advantage of a liberal construction of the arguments raised in these filings," and to proceed otherwise would be to "allow attorneys who may not be admitted to the Court's bar or who have been disbarred or suspended from practicing before the Court to nonetheless 'guide[] the course of litigation with an unseen hand.'" Id. (citing Duran v. Carris, 238 F.3d 1268, 1271 (10th Cir. 2001)) (alterations in original). Dong's initial petition for review was prepared by an entity based in California called "Kindness Immigration Services," but Dong has no counsel of record and is otherwise appearing pro se before this Court. Besides, the Government's fears are misplaced; Dong's brief appears to be a near-direct copy of her brief before the BIA, with "petitioner" replacing "respondent" and with a few added details pertaining to the BIA. Compare, e.g., Inf. Br. 5, with A.R. 11.

9

credibility determination based on speculation and conjecture); Gao, 299 F.3d at 276 ("Adverse credibility findings are afforded substantial deference so long as the findings are supported by specific cogent reasons."). In any case, we are limited to reviewing "the rationale that the agency provide[d]" in rendering its decisions. Konan v. Att'y Gen., 432 F.3d 497, 501 (3d Cir. 2005).

As Dong commenced her petition for asylum after the May 2005 effective date of the REAL ID Act, its provisions apply to this case. Cf. Yusupov v. Att'y Gen., 650 F.3d 968, 991 n.34 (3d Cir. 2011). Therefore, the IJ was permitted to "base a credibility determination" on matters that did not "go[] to the heart of [Dong's] claim," as well as on observations of demeanor, analysis of her story's plausibility, and examination of the consistency of her statements. 8 U.S.C. § 1158(b)(1)(B)(iii); see also Lin v. Mukasey, 534 F.3d 162, 167 (2d Cir. 2008) ("[A]n IJ may rely on *any* inconsistency or omission in making an adverse credibility determination as long as the 'totality of the circumstances' establishes that an asylum applicant is not credible."); Kaita v. Att'y Gen., 522 F.3d 288, 296 n.6 (3d Cir. 2008).[4]

An alien applying for asylum may satisfy her burden through two interrelated routes. She may show that she suffered past persecution on account of one of five

---

[4] We have yet to apply the REAL ID Act standard regarding credibility in a precedential opinion. Because we hold that the credibility determination in this case is flawed for reasons that are not anchored to the statutory shift in standards, we need not consider whether the current 8 U.S.C. § 1158(b)(1)(B)(iii) is consistent with concepts of constitutional due process.

10

enumerated grounds.  See 8 U.S.C. § 1101(a)(42)(A) (defining "refugee" as one who suffers persecution on the basis of race, religion, nationality, membership in a particular social group, or political opinion); see also Huang v. Att'y Gen., 620 F.3d 372, 380–81 (3d Cir. 2010).  A showing of past persecution creates a presumption of a well-founded fear of future persecution.  8 C.F.R. § 1208.13(b)(1).  Alternatively, a potential asylee who cannot demonstrate past persecution may instead show a subjectively and objectively reasonable fear of future persecution on one of the statutory grounds.  Zubeda v. Ashcroft, 333 F.3d 463, 469 (3d Cir. 2003).  The standard for withholding of removal is "similar to, but more stringent than, the standard for asylum," requiring "a withholding applicant [to] establish a 'clear probability' that h[er] life or freedom would be threatened because of an enumerated characteristic."  Li v. Att'y Gen., 633 F.3d 136, 140 (3d Cir. 2011).[5]

In an asylum proceeding, the burden of proof is on the applicant "to establish that he or she is a refugee," but "[t]he testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration."  8 C.F.R. § 1208.13(a).  However, an applicant's testimony standing alone is sufficient "only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee."  8 U.S.C. § 1158(b)(1)(B)(ii).  "Where the trier of fact determines that the applicant should provide

---

[5] We agree with the Government that  Dong did not challenge the IJ's denial of her CAT claim before the BIA.  We therefore do not discuss it further.  8 U.S.C. § 1252(d)(1).

evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence." Id. A failure to provide corroborating evidence may be fatal only in limited circumstances, and requires, in any case, that "an applicant be given the opportunity to produce the corroborating evidence." Dong v. Att'y Gen., 638 F.3d 223, 229 (3d Cir. 2011).

III.

The IJ based her adverse credibility determination on two grounds. First, there are indeed differences between Dong's written statement in her I-589 application and her exhibits/oral testimony. For example, while Dong's I-589 application noted her support for "Falun Gong in the United States," A.R. 453, it did not explicitly state that Dong herself now participated in Falun Gong activities. Also, while Dong reported being "hit and kick[ed]" during the attacks, the I-589 contained no detail of the extent of her injuries nor of her hospitalization. A.R. 460. Second, the IJ found several of Dong's statements to be "unpersuasive and illogical" or "not plausible."

With regard to inconsistencies, while the REAL ID Act allows for an adverse credibility determination to be based on inconsistent testimony, it nowhere abrogates the duty of the fact-finder to view such evidence in light of the factual record as a whole. See Lin, 534 F.3d at 167. And when viewed as a whole, the record shows a remarkable consistency within the story Dong presented, especially given the pressing externality of the passage of time. This is all the more striking when paired with the numerous exhibits,

12

many of which corroborated her story as told—yet these exhibits are barely mentioned in either the IJ's or the BIA's opinions, and when they are mentioned it is only to emphasize the (comparatively minor) inconsistencies. For example, neither the IJ nor the BIA mentioned the police-warning document submitted by Dong, if even to explain why they did not give it credence. We have never required a fact-finder or appellate tribunal to expound at length on every piece of evidence, see Wong v. Att'y Gen., 539 F.3d 225, 231 (3d Cir. 2008), but Dong's evidentiary proffer was barely discussed in the relevant opinions, despite the fact that she emphasized the relevance of her exhibits in her brief before the BIA. The BIA should have at least acknowledged the submissions that supported and corroborated Dong's testimony in determining whether the IJ's credibility finding was supported by clear evidence. Id. at 388–89; see also Toussaint v. Att'y Gen., 455 F.3d 409, 414 (3d Cir. 2006) ("[T]he BIA should indicate its reasons for discrediting certain testimony or documentary evidence."). That it did not do so is troubling, all the more so given Dong's raising of the issue before the BIA.[6] See Huang, 620 F.3d at 388 (observing that the BIA "may not ignore evidence favorable to the alien, particularly when, as here, the alien's administrative brief expressly calls the BIA's attention to it").

---

[6] The existence of corroborating evidentiary submissions would appear to distinguish this case from Ying Li v. Bureau of Citizenship & Immigration Services, 529 F.3d 79 (2d Cir. 2008), a factually similar case cited here by the BIA. Li's story was specifically identified by the Second Circuit as being "drawn in a way that evades corroboration to an unusual extent." Id. at 83. Here, not only is Dong's story not drawn in a way to avoid corroboration, she specifically provided corroboration from both affidavit and documentary (hospital records, police postings) sources.

13

The failure of the BIA and IJ to give any explanation as to their rejection of Dong's corroborating evidence attenuates our ability to conduct even our limited review. "Where the administrative decision fails to consider or mention evidence that is on its face relevant and persuasive, the proper course is to remand for further consideration . . . ." Chukwu, 484 F.3d at 189; see also Huang, 620 F.3d at 389 (remanding when BIA decision did not indicate that it conducted plenary review).

Furthermore, not all of the inconsistencies identified by the BIA and IJ are appropriately characterized as such. For example, both tribunals placed great emphasis on "the inconsistency between the respondent's testimony that she suffered from headaches following her first detention and her testimony that in China she had no reason to practice Falun Gong." A.R. 3 (BIA decision), 46 (similar concern raised in IJ's decision). Yet Dong emphasized that the injuries she suffered in the first attack were swiftly resolved after medical intervention. See, e.g., A.R. 132–34. The IJ specifically found that Dong had "headaches for about 1 week" after the first detention. A.R. 40. By contrast, Dong emphasized that she suffered from chronic "nightmares and headaches" following the *second* detention, A.R. 133, 135. Seeking medical treatment in the United States was not as possible because "doctor[s] and medicine cost a lot of money." A.R. 135. Dong had previously testified that she did not practice Falun Gong in China because, at the time, she lacked a "big problem" with her health, which she identified as a primary reason for using Falun Gong. A.R. 123–24. We cannot say that Dong's testimony about why she declined to practice Falun Gong following the first detention is

14

incompatible with the explanation for why she practiced Falun Gong following her second detention and her flight to the United States. Dong clearly equated the practice of Falun Gong with treating chronic issues, which she testified arose only after the second detention. See Issiaka v. Att'y Gen., 569 F.3d 135, 141 (3d Cir. 2009) (emphasizing, in pre-REAL-ID case, the internal consistency of alien's statements as relevant to credibility determination); see also Chukwu, 484 F.3d at 191 ("Because the IJ relied on inconsistencies that were explained by evidence in the record, with no explanation of why the probative evidence in the record might have been rejected, we must remand for consideration of that evidence.").

Nor do we believe that the IJ and BIA correctly dealt with Dong's Falun Gong affiliation. First and foremost, we agree with Dong that her practice of Falun Gong in the United States would not make or break her asylum application; rather, her activities *in support of* Falun Gong both in China and abroad could suffice to mark her for mistreatment upon her return. Despite this, the IJ based the adverse credibility determination, in part, on Dong's "fail[ure] to present reasonably available corroborative documents" relating to her Falun Gong practice. A.R. 46. Yet Dong *did* present evidence to this effect: photographs of her Falun Gong activities, for example, and an affidavit from a potential witness. We discern no sign that Dong was ever told that she would have to present more evidence on what was, in effect, a secondary aspect of her claim; indeed, when asked why she had not submitted more information or procured a "better" witness, she replied that she "didn't know it's necessary," A.R. 149, and that

15

many Falun Gong practitioners "don't want too many people to know that they practice Falun Gong." A.R. 150

The above example highlights the central problem in the agency opinions: a reliance on implausibility that is nowhere defined. The IJ, for example, observed that Dong's story about delivering a list of Falun Gong practitioners to the cadres after her second detention—and, specifically, her inability to articulate details about the transfer—was "not believable" and "not plausible." A.R. 46. Dong had testified that the cadres knew where she lived (as demonstrated by repeated threats), and presumably believed she was afraid enough to cooperate with the government, as she had already paid the 2,000 Yuan fine they demanded. Nowhere does the IJ explain *why* such an answer is unbelievable or implausible. "[W]here an IJ bases an adverse credibility determination in part on 'implausibility' as the IJ did here, such a conclusion will be properly grounded in the record only if it is made against the background of the general country conditions." Jishiashvili v. Att'y Gen., 402 F.3d 386, 393 (3d Cir. 2005). The IJ was perfectly entitled to find several of Dong's answers to be unsatisfying, but deriving a credibility determination from, for instance, Dong's uncertainty about whether her asylum application was public material, A.R. 142–43—and her concomitant concern for the wellbeing of her family that is repeated throughout the record—elevates the personally unsatisfying to an impermissible level.[7]

---

[7] One argument that has haunted this proceeding at all stages is the assertion that Dong's support of, but failure to practice, Falun Gong while in China was, in some way,

In sum, the two primary problems identified above—the failure by both tribunals to explain their rejection of Dong's corroborating evidence and the shaky foundation of the adverse credibility determination—operate both separately and in tandem to compel our granting of this petition for review. See Thu v. Att'y Gen., 510 F.3d 405, 416 (3d Cir. 2007) (observing that the challenges of forming a credibility determination are "challenges that can most effectively be met by consideration of all of the facts available in the record"). We cannot find that the credibility determination is supported by substantial evidence, especially when considered in light of a record that, as a whole, tends to support Dong's version of events when Dong's copious evidentiary submissions, few of which were discussed in the agency opinions, are taken into account. It is true that, post REAL-ID, administrative officials have ever-greater leeway in assessing the credibility of the parties before them, and we in turn owe the requisite deference to those determinations. Nor, we hasten to add, do we forestall the possibility that the IJ and BIA could correctly find Dong to be not credible on an alternative (or augmented) basis. Still, whatever the REAL ID Act may be said to constitutionally allow—a question we leave

inherently suspect or implausible. See A.R. 156 (from the Government: "[w]hy would one chose [*sic*] to speak out against Falun Gong and even hand out flyers on behalf of Falun Gong but not practice it?"), A.R. 3 (from the BIA: "Further, the Immigration Judge relied on the inherent implausibility of the respondent's advocacy and support for Falun Gong in China when she had not learned or participated in the practice of Falun Gong in China."). We do not believe it controversial to suggest that, at times, a person may support a cause with which he or she is otherwise unaffiliated, despite lack of personal gain and at great personal risk. It is not inherently incredible that someone would publicly ally herself with an unpopular group despite knowing that such activities might draw official, harsh reprisals.

17

for another day—it cannot support an outcome based on undefined implausibilities and impracticalities, and one that further overlooks a great deal of evidence suggesting a contrary conclusion.

IV.

For the reasons above, we will grant the petition for review and remand for further proceedings consistent with this opinion. We stress that our decision today does not resolve the question of whether Dong is otherwise eligible for the relief of asylum or withholding of removal. See Voci v. Gonzales, 409 F.3d 607, 615 (3d Cir. 2005). Those matters will be evaluated by the BIA and, if need be, by the IJ in the first instance.